BUCYRUS-ERIE COMPANY, Petitioner-Appellant, v. DE-
PARTMENT OF INDUSTRY, LABOR & HUMAN RELA-
TIONS, EQUAL RIGHTS DIVISION, Respondent.

Supreme Court

*No. 76–635. Argued May 1, 1979.—Decided June 29, 1979.*
(Also reported in 280 N.W.2d 142.)

410

For the appellant there were briefs by *David M. Goelzer,* Bucyrus-Erie Company, Milwaukee, and *Gerald A. Golden, Marc S. Krass* and *Seyfarth, Shaw, Fairweather & Geraldson* of Chicago, Illinois, and oral argument by *Mr. Golden.*

There was a joint brief by *Bronson C. La Follette,* attorney general, and *David C. Rice,* assistant attorney general, for Department of Industry, Labor and Human Relations; and *John Theiler Bode* and *Foley & Capwell, S.C.,* of Racine, for Thomas Parks, with oral argument by *Mr. Rice,* assistant attorney general.

CONNOR T. HANSEN, J. This case involves the interpretation and application of certain statutory provisions of the Wisconsin Fair Employment Act as set forth in Chapter 111, Stats. That the development of standards as they relate to these statutes is somewhat uncertain is perhaps evidenced by remarks of both counsel at oral argument, the fact that this case and its predecessor, *Chicago, M., St. P. & P. RR. Co. v. ILHR Dept.,* 62 Wis.2d 392, 215 N.W.2d 443 (1974), resulted in two-to-one decisions by DILHR and that in the intervening case of *Connecticut General Life Ins. Co. v. DILHR,* 86 Wis.2d 393, 273 N.W.2d 206 (1979), we reversed.

Parks, then twenty-three years of age, applied for work as a welder at Bucyrus-Erie in July, 1973. On the basis of an interview and a welding test Parks was found to be qualified as a welder. However, the required pre-employment physical examination disclosed that Parks had three congenital back defects. On the basis of the corporate medical director's recommendation the company refused to hire Parks as a welder. Parks filed a complaint with the Equal Rights Division of DILHR pursuant to sec. 111.32(5), Stats. 1973, charging Bucyrus-Erie with discrimination on the basis of handicap.

At the hearing held before a department examiner on August 11, 1975, the parties stipulated that Parks had applied for and had been denied work as a welder because of his physical condition. The examiner then found that a prima facie case of discrimination existed which the company had the burden of rebutting.

Leroy E. Johannsen, the company's personnel supervisor in 1973, testified regarding the duties involved in welding work at Bucyrus-Erie. It was his testimony that a welder would be required to work inside large weldments (unfinished machinery). This would require crawling into the weldment while carrying tools and equipment and working in a squatting position in cramped quarters. A welder would also have to work on the side of large weldments while standing on a ladder or suspended from a cable and had to lift 60 pound reels of wire to change the wire feeding machine once or twice a day. A welder had to be able to carry and use a 10 pound welding stick, a 20 pound chipping hammer, occasionally use a sledge hammer and lift up to 60 pounds of cable and carry it up a ladder. Hoists were available in some work areas to assist the welders and a welder generally would not be able to carry his tools and the cable at the same time.

Dr. George V. Murphy, the company's medical director, a board-eligible internist and specialist in family practice and industrial medicine, performed Parks' pre-employment physical examination and testified at the hearing. Medical reports were also considered from two other doctors. Dr. G. Biedlingmaier, a hospital radiologist, examined the back x-rays of Parks at the request of Dr. Murphy and made his report to Dr. Murphy prior to the time Dr. Murphy recommended that Parks not be hired as a welder. Dr. William Chalos, an orthopedic surgeon engaged by Parks, also examined the company x-rays, had additional x-rays taken, examined Parks and submitted his written report.

Dr. Murphy testified that a welding job was moderately heavy work and that a welder must have the physical size and stamina necessary to lift, carry and pull weights up to 60 pounds with some frequency. He said a welder must be of at least average stature, weight and strength. He did not find anything physically wrong with Parks other than three congenital back defects disclosed by the x-rays:

1. An incomplete fusion of the first sacral vertebra;
2. spondylolisthesis of the fifth lumbar vertebra;[1]
3. an abnormal angulation of one of the corresponding joints between the last lumbar and first sacral vertebra.

In his report to Dr. Murphy, Dr. Biedlingmaier confirmed the first two conditions. Murphy explained that the abnormal angulation was not originally noted. Murphy testified that he also suspected that Parks had spondylolysis[2] because a certain number of people with spondylolisthesis also have spondylolysis, but he said a different x-ray would be needed to diagnose the latter condition. He said only the first three defects existed to a reasonable degree of medical certainty.

It was the opinion of Dr. Murphy that these conditions would restrict Parks' ability to work as a welder because they substantially increased the likelihood that he would injure his back in the normal course of his job duties. He explained that people with spondylolisthesis generally do not experience any difficulty early in life and that some of those affected never have back problems. However, those who perform heavy work throughout their lives have a substantial chance of developing back difficulties. Murphy was also of the opinion it was possible to have the condition and not know it because it would

[1] "Spondylolisthesis involves the displacement of one of the vertebra over one of its fellow below, usually in the lower lumbar area."

[2] "Spondylolysis is the disintegration or dissolution of the vertebra."

not normally manifest itself until later years absent an unusual strain or accident. He said it was possible for a person with spondylolisthesis to work as a welder without physical injury but that the heavy lifting and working in unusual positions would produce effects in the back that were detrimental to one's health. He testified that persons with spondylolisthesis had a substantial danger of developing back pain, were more prone to disc injuries and posed a safety hazard in a welding job because sudden back pain could cause a welder to drop tools or equipment on himself or others. The company had previously experienced a situation where a welder with such pain was unable to extricate himself from a weldment.

Murphy further testified that in recommending that Parks not be hired as a welder he relied on both the spondylolisthesis and the possible spondylolysis. In arriving at this conclusion he considered the employment standards for back x-rays given in an article printed in the September, 1967, American Journal of Industrial Medicine at the request of the American Orthopedic Society, which was received in evidence. These standards limited persons with spondylolisthesis to white collar, clerical and light physical types of work. Murphy said that a welder had to be able to lift 60 pounds two to three times a day and that he thought Parks was presently able to do that.

The report of Dr. Chalos stated that Parks had no history of back injury and that he denied any back or leg pain. It said that spinal x-rays revealed "an incomplete closure of the posterior elements of S1" and the "L5 appeared slightly forward of S1 indicating a possibility of a spondylolisthesis," but that "no actual defect was noted in the pars intraarticularis of L5." The report indicated that Dr. Biedlingmaier, the hospital radiologist, agreed with this diagnosis. Dr. Chalos and another radiologist reviewed the x-rays taken by the company in

conjunction with the x-rays he had taken and they reached the same conclusion. Dr. Murphy reviewed Dr. Chalos' report and testified that he saw no conflict with his own diagnosis.

Parks testified that prior to applying to Bucyrus-Erie he had worked at Joseph Schlitz Company as a packer and scrap baler, a job that involved lifting up to 70 pounds. He said all the jobs he had held had involved lifting and that he could lift over 100 pounds. He said he saw Dr. Chalos because he had never had any back trouble and Dr. Murphy had told him he had a congenital defect which would limit his lifting to 35 pounds. Three weeks after being disqualified by Bucyrus-Erie, Parks said he was hired by C. K. Welding. In October, 1973, he was hired by Caterpillar Tractor Company as a welder but worked as a gas cutter because no welding work was available. It was his testimony that a physical examination was required for the job at Caterpillar. It was also his testimony that a chipping hammer actually weighed about five pounds and that a welder would usuall carry a pliers, snippers, weld gauge, helmet and gloves.

On the basis of this testimony the hearing examiner made the following recommended findings of fact:

"3. At the time he applied for employment, Complainant was capable of safely and efficiently performing the job functions of the welding position at the standards set by the employer.

"4. Respondent denied Complainant employment as a welder because his pre-employment physical revealed a congenital back deformity that Respondent speculated might affect Complainant's work performance or safety at some unspecified future date."

and these recommended conclusions of law:

"3. Respondent discriminated against Complainant in refusing to hire him on the basis of his handicap which

Respondent perceived to present a possible future employment risk.

"4. Respondent has not sustained its burden of proving that the Complainant could not have safely and efficiently performed the job applied for at the standards set by the employer."

Two members of the commission ordered that the recommended decision be adopted in its entirety. The third commissioner dissented on the ground that the evidence demonstrated a high potential of future injury to Parks and the company had a legitimate interest in protecting itself against a potential worker's compensation claim. He recommended that the commission construe the handicap provision to exempt from coverage under the Act any potential health risks proven to a reasonable medical certainty.

Bucyrus-Erie petitioned for judicial review of the department order. The circuit court affirmed the order and Bucyrus-Erie appeals from the order of the circuit court.

The issue presented is whether there is substantial evidence in the record to support the department's decision that Parks was physically able to safely and efficiently perform the duties of a welder at the standards set by Bucyrus-Erie?

In reviewing an order of the circuit court affirming an order of an administrative agency the task of this court is to determine whether the circuit court erred in its determination. *Clintonville Transfer Line v. Public Service Comm.*, 248 Wis. 59, 76, 77, 21 N.W.2d 5 (1945). The scope of the circuit court's review of the agency decision is defined by sec. 227.20, Stats. 1977. Such review must be confined to the record, sec. 227.20(1), and must separately consider questions of law, fact and procedure, sec. 227.20(3). The following standards are

established by sec. 227.20 for reviewing issues of law and fact:

"(5) The court shall set aside or modify the agency action if it finds that the agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action, or it shall remand the case to the agency for further action under a correct interpretation of the provision of law.

"(6) If the agency's action depends on any fact found by the agency in a contested case proceeding, the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact. The court shall, however, set aside agency action or remand the case to the agency if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record."

Under subsection (5), questions of law are always reviewable by the court. *Pabst v. Department of Taxation,* 19 Wis.2d 313, 322, 120 N.W.2d 77 (1963). The construction of a statute or the application of a statute to a particular set of facts is such a question of law. *Milwaukee County v. ILHR Dept.,* 80 Wis.2d 445, 455, 259 N.W.2d 118 (1977) ; *Dept. of Revenue v. Milwaukee Refining Corp.,* 80 Wis.2d 44, 48, 257 N.W.2d 855 (1977). Although the court is not bound by the agency's interpretation, some deference must be given the agency in those areas in which it has specialized knowledge and expertise. Sec. 227.20(10), Stats. The court will hesitate to substitute its judgment for that of the agency on a question of law if

". . . a rational basis exists in law for the agency's interpretation and it does not conflict with the statute's legislative history, prior decisions of this court, or constitutional prohibitions." *Pabst, supra,* at 324.[3]

---

[3] *See also: Milwaukee County v. ILHR Dept., supra,* at 456, and cases cited therein.

In reviewing agencies' factual finding this court has explained that substantial evidence is ". . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Bell v. Personnel Board,* 259 Wis. 602, 608, 49 N.W.2d 889 (1951).

It has been held that:

"Substantial evidence is not equated with preponderance of the evidence. There may be cases where two conflicting views may each be sustained by substantial evidence. In such a case it is for the agency to determine which view of the evidence it wishes to accept. . . ." *Robertson Transport Co. v. Public Serv. Comm.,* 39 Wis. 2d 653, 658, 159 N.W.2d 636 (1968),

and in *Copland v. Department of Taxation,* 16 Wis.2d 543, 554, 114 N.W.2d 858 (1962):

" '[T]he term "substantial evidence" should be construed to confer finality upon an administrative decision on the facts when, upon an examination of the entire record, the evidence, including the inferences therefrom, is found to be such that a reasonable man, acting reasonably, *might* have reached the decision; but, on the other hand, if a reasonable man, acting reasonably, *could not* have reached the decision from the evidence and its inferences then the decision is not supported by substantial evidence and it should be set aside.' "

The reviewing court cannot evaluate the credibility or weight of the evidence. *Stacy v. Ashland County Dept. of Public Welfare,* 39 Wis.2d 595, 603, 159 N.W.2d 630 (1968). In determining whether evidence is "substantial," the court cannot rely solely on an isolated piece of testimony which is explained or discredited by other testimony. *Albrent Freight & S. Co. v. Public Service Comm.,* 263 Wis. 119, 128, 56 N.W.2d 846, 58 N.W.2d 410 (1953). The court must consider any impeaching or rebutting testimony in determining whether substan-

tial evidence exists to support the agency's findings. *Motor Transport Co. v. Public Service Commission,* 263 Wis. 31, 44, 45, 56 N.W.2d 548 (1953).

The defense of Bucyrus-Erie in this discrimination case was based on the exception contained in sec. 111.32 (5) (f), Stats. 1973:

"(f) The prohibition against discrimination because of handicap does not apply to failure of an employer to employ or to retain as an employe any person who because of a handicap is physically or otherwise unable to efficiently perform, at the standards set by the employer, the duties required in that job. . . ."[4]

They argue that an employer does not unlawfully discriminate on the basis of handicap by rejecting an applicant for a particular job who, due to his medical condition, would pose a substantial threat to the safety of himself or others if hired. DILHR, in its brief acknowledges there is "some merit to the argument." We agree. However, as we view the record in this case, there was substantial evidence presented to support the finding of the department that Parks was not such a person.

This court has said that the provisions of the Wisconsin Fair Employment Act are to be liberally construed to effect the Act's purpose, preventing discrimination which tends to deprive the victims of earnings necessary to maintain a just and decent standard of living. *Wisconsin Telephone Co. v. ILHR Dept.,* 68 Wis.2d 345, 368, 228 N.W.2d 649 (1975) ; sec. 111.31, Stats.

In *Chicago M., St. P. & P. RR. Co. v. ILHR Dept., supra,* this court considered the argument here advanced

---

[4] This section was subsequently repealed and recreated by section 18, chapter 275, Laws of 1975, effective May 27, 1976. The agency order was made May 13, 1976, prior to the effective date of the new statute and the application of the new statutory language is not an issue here.

by Bucyrus-Erie. The complainant in that case had been hired by the railroad as a laborer and was given a physical examination before starting work. He disclosed a prior history of asthma to the company physician and his x-rays revealed a slight disc space narrowing at L5–S1. He was discharged after working for two weeks, apparently because of his back disability. In a hearing before the agency the company physician testified that he recommended that complainant be rejected as a laborer because of his history of asthma. The department found in favor of the complainant in a two-to-one decision and the circuit court affirmed the department's order. After concluding that asthma was, in fact, a handicap within the statute's protection, this court reviewed the record for evidence establishing the employer's defense and concluded,

"On review of the record as a whole, there is no evidence that Goodwin was unable to efficiently perform the duties of his job as a common laborer. Goodwin performed without ill effects all of the tasks assigned to him in the diesel house. *In fact, there was no medical testimony that, to a reasonable degree of medical certainty, the working conditions were or would be in the future hazardous to his health.*

"On the contrary, there was testimony that Goodwin successfully passed his military preinduction physical and two other physicals necessary for strenuous jobs he held after his termination. The complainant has had no recurrence of his childhood asthmatic condition for over seven years and has continued participating in sports since high school. In fact, the record as a whole reveals that the complainant was physically qualified to efficiently perform the duties of his job as a common laborer and that the department's finding to that effect is supported by the substantial evidence." (Emphasis added.) *Id.* at 398, 399.

Bucyrus-Erie here contends that it presented testimony to a reasonable degree of medical certainty that the

working conditions would be hazardous to the complainant's health in the future and that it, therefore, met the burden of proof as set forth in *Chicago, M., St. P. & P. RR. Co. v. ILHR Dept., supra.* DILHR found that Bucyrus-Erie had not sustained its burden of proof and that the company had discriminated against Parks in refusing to hire him on the basis of a handicap ". .". which Respondent perceived to present a possible future employment risk." Actually, these findings and conclusions could reasonably be interpreted to mean that DILHR was applying a lesser standard of proof than that suggested by Bucyrus-Erie.

Certainly the ability to perform work safely is one aspect of efficient performance of a particular job and therefore could reasonably be included in work standards set by an employer. An employer can not be said to have discriminated against an employee if it can prove to a reasonable probability that job duties and working conditions would be hazardous to the employee's health in the future or that employee's disability would present a hazard to other employees or frequenters.[5]

The right of an employer to refuse to hire an applicant whose physical condition could threaten his own or others' safety in the course of performing his job duties has been considered by the federal courts under both Title VII and the Age Discrimination in Employment Act.[6] In *Hodgson v. Greyhound Lines, Inc.,* 499 Fed.2d 859 (7th Cir. 1974), *cert. denied sub nom., Brennan v. Greyhound Lines, Inc.,* 419 U.S. 1122 (1975), the court said that because the nature of a bus driver's job required consideration of the safety of bus passengers and

---

[5] See: Safe Place statute, sec. 101.11(1), Stats.

[6] This court has looked to such federal decisions before for guidelines in applying the state fair employment law. *Ray-O-Vac v. ILHR Department,* 70 Wis.2d 919, 236 N.W.2d 209 (1975).

highway motorists the court would evaluate the employer's proof under the test set forth in *Diaz v. Pan American World Airways, Inc.*, 442 Fed.2d 385 (5th Cir. 1971), whether the essence of the business operation would be undermined if the age qualification were not used. The court said the essence of a bus line is safe transportation and that the employer need only show a rational basis in fact to believe that the elimination of its maximum hiring age would result in even a minimal increase in the likelihood of risk of harm to its passengers. The court concluded that the bus company had adequately met the burden of proof by presenting statistical evidence of safety records for bus drivers at various ages, testimony regarding the rigors of job assignments for new employees and evidence that physical changes occur with age that are not readily determinable on an individual basis.

In *Usery v. Tamiami Trail Tours, Inc.*, 531 Fed.2d 224 (5th Cir. 1976), the court held that the safety of third parties was a factor that had to be considered and concluded:

". . . The greater the safety factor, measured by the likelihood of harm and the probable severity of that harm in case of an accident, the more stringent may be the job qualifications designed to insure safe driving. . . .
". . . .
". . . We emphasize safety in busing just as we would in a variety of other industrial areas where safety to fellow employees is of such humane importance that the employer must be afforded substantial discretion in selecting specific standards which, if they err at all, should err on the side of preservation of life and limb. The employer must of course show a reasonable basis for its assessment of risk of injury/death. But it cannot be expected to establish this to a certainty, for certainty would require running the risk until a tragic accident would prove that the judgment was found. Priceless as is a single life in our concept of the value of human life and our undoubted unwillingness ever to approve a practice which might kill one but not, say, twenty, we think

the safety factor should be evaluated in terms of the possibility or likelihood of injury/death." *Id.* at 236–238.

This high standard of care which a common carrier owes to its passengers has also been relied on to sustain a variety of job classifications in the airline industry.[7]

Obviously the high standards recognized for certain employees in the common carrier industry are not applicable to a welder at Bucyrus-Erie. The point is that we believe safety with regard to both the handicapped employee's future health and well-being and others is a factor to be accorded some recognition in cases arising under sec. 111.32(5)(f), Stats. 1973. The ability to efficiently perform embraces more than the physical strength and dexterity required to adequately perform at the moment of application for employment. It embraces the ability to perform without a materially enhanced risk of death, or serious injury to the employee or others in the future and the statute must be so construed. We do not believe that the legislature when proscribing discrimination against those physically handicapped intended to force an employer into the position of aiding a handicapped person to further injury, aggravating the intensity of the handicap or creating a situation injurious to others. Such an interpretation would compromise not only the best interests of the handicapped but all concerned. It is important that each case be individually evaluated and decided upon the evidence presented by both parties. Further, we do not believe that it can reasonably be held that an employer has not discriminated because it catagorically relies upon the opinion

---

[7] *See, e.g., Boyd v. Ozark Air Lines, Inc.,* 568 Fed.2d 50 (8th Cir. 1977); *Spurlock v. United Airlines, Inc.,* 475 Fed.2d 216 (10th Cir. 1972); *Harriss v. Pan Am. World Airways, Inc.,* 437 Fed. Supp. 413 (N.D. Cal. 1977); *Condit v. United Air Lines, Inc.,* 12 Empl. Prac. Dec., Para. 11,195 (E.D. Va. 1976).

of the company doctor, important as his expert and medical opinion may be.

This court in *Chicago, M. St. P. & P. RR. Co. v. ILHR Dept., supra,* recognized that aggravation of the employee's physical disability should be considered as well as the risk of injury the employee poses to himself and others. If the evidence shows that the applicant has a present ability to physically accomplish the tasks which make up the job duties, the employer must establish to a reasonable probability that because of the complainant's physical condition, employment in the position sought would be hazardous to the health or safety of the complainant or to other employees or frequenters of the place of employment. However, in the instant case, Bucyrus-Erie has not proved such facts and there is substantial evidence to support the findings of DILHR.

The medical expert called by the company testified that persons with spondylolisthesis had a substantially increased likelihood of injuring their backs in the normal course of a welder's duties, that they generally experienced no difficulty early in life and that some never had back problems, but that those who performed heavy work throughout their lives had a substantial chance of developing back injuries. He said it was possible for someone with spondylolisthesis to work as a welder, that the condition only increased the likelihood of back problems and that the job would produce effects in Parks' back detrimental to his health. With regard to the safety hazard that Parks' condition posed the medical expert testified that a person with spondylolisthesis had a substantial danger of developing back pain, was more prone to drop things, and also that Parks could have difficulty getting out of a weldment. The medical expert said his conclusions were based on both the spondylolisthesis condition he diagnosed and the spondylolysis condition he

suspected. He was unable to say when back problems were likely to develop, or what percent of such people do develop problems and what percent do not. He did not indicate whether problems that could in fact develop would be disabling. He did not point to a single instance · where a welder with spondylolisthesis had injured his back on the job or had created a threat of injury to others.

Although the testimony of the company's expert regarding the effects of these two back conditions was unrebutted, the diagnosis was not. The report of Parks' own medical expert indicated only a possibility of spondylolisthesis and did not indicate the presence of spondylolysis. It also stated that Parks had no history of back trouble or back or leg pains. The additional facts that Parks had held several strenuous jobs before applying to Bucyrus-Erie and held jobs as a welder and as a gas cutter afterwards, all without experiencing back problems, were also before the commission. Based upon the record as we view it, the decision of the commission is supported by substantial evidence and the order of the trial court is affirmed.

*By the Court.*—Order affirmed.