CHICAGO & NORTH WESTERN RAILROAD (Chicago & North Western Transportation Company), Appellant-Petitioner,

v.

LABOR & INDUSTRY REVIEW COMMISSION, Respondent.

Supreme Court

*No. 78–416. Argued September 29, 1980.—Decided October 28, 1980.*

(Also reported in 297 N.W.2d 819.)

For the appellant-petitioner there was a brief by *Roger S. Bessey, James T. Murray, Jr.,* and *Borgelt, Powell, Peterson & Frauen, S.C.,* of Milwaukee, and oral argument by *James T. Murray, Jr.*

For the respondent the cause was argued by *David C. Rice,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

COFFEY, J. This is a review of a court of appeals' decision[1] affirming a judgment of the circuit court and a decision and order of the Labor and Industry Review Commission (Commission-Respondent) finding that the Chicago and North Western Railroad Co. (petitioner-railroad), had unlawfully discriminated against Glen A. Pritzl, a welder employed by the railroad on the basis of handicap, contrary to the Wisconsin Fair Employment Act, secs. 111.31 through 111.37, Stats.

Mr. Pritzl filed a complaint with the Wisconsin Department of Industry, Labor and Human Relations, alleging that he had been discriminated against with respect to employment when the railroad determined that he was not qualified to return to work as a welder due to his epilepsy. Thereafter, the parties attempted to resolve the controversy "by conference, conciliation or persuasion" pursuant to sec. 111.36(3)(a), Stats. These efforts failed and the matter was referred to a hearing examiner on March 18, 1975.

At the hearing it was stipulated that Mr. Pritzl had experienced two grand mal epileptic seizures prior to his termination. The first seizure occurred on June 12, 1971, approximately one month after he suffered a head injury in an automobile collision. The second seizure occurred on October 24, 1971, while Pritzl was on a leave of absence granted by the railroad as a result of an injury received in a horse riding accident on August 27, 1971. Pritzl returned to work and performed some duties for the railroad after the original onset of epilepsy and before the horse riding accident, but his affliction was not diagnosed as epilepsy until after the second seizure on October 24th. Following this diagnosis, Pritzl was placed on anticonvulsive agents, dilantin and phenobarbital. It was also stipulated that Pritzl did not

---

[1] The decision of the court of appeals is reported at 91 Wis.2d 462, 283 N.W.2d 603 (Ct. App. 1979).

return to work for the petitioner after the horse riding incident and the railroad disqualified him for employment as a welder on the basis of his epileptic seizures on April 24, 1972. The railroad refused to reinstate him despite the receipt of his physician's certification of capability to perform his usual duties. Further, it should be noted that the petitioner did not dispute Pritzl's testimony that he was seizure free from October 24, 1971, (second epileptic convulsion) through the date of his discharge, April 24, 1972.

The question presented to the hearing examiner was whether the railroad's action in terminating Pritzl's employment as a welder was lawful under the provisions of sec. 111.32(5)(f), Stats. 1973.[2] Specifically, the hearing examiner was asked to determine if Pritzl's handicap, epilepsy, rendered him "physically or otherwise unable to perform" the duties of a welder according to the petitioner's standards. Since the ability to perform work safely is one aspect of the efficient performance of a job,[3] the bulk of the evidence adduced at the hearing concerned the job duties of welders and Pritzl's ability to safely perform those duties.

Pritzl and three of the railroad's employees testified as to a welder's duties and work environment. Pritzl testified that during his employ with the petitioner he

---

[2] Sec. 111.32(5)(f), Stats. 1973, provided:

"(f) The prohibition against discrimination because of handicap does not apply to failure of an employer to employ or to retain as an employe any person who because of a handicap is physically or otherwise unable to efficiently perform, at the standards set by the employer, the duties required in that job. An employer's exclusion of a handicapped employe from life or disability insurance coverage, or reasonable restriction of such coverage, shall not constitute discrimination."

[3] See: Bucyrus-Erie Co. v. ILHR Dept., 90 Wis.2d 408, 280 N.W.2d 142 (1979); Chicago M., St. P. & P. RR. Co. v. ILHR Dept., 62 Wis.2d 392, 215 N.W.2d 443 (1974).

operated a tractor, bail loader and "motor cars"[4] in and around the railroad yard. He further testified that his primary duties, with a helper assisting, entailed welding rail joints, switch points and cutting the rails and the bolts used to fasten the rails to the ties with an acetylene torch. He also testified that he was at times required to work on and around bridges.

Edward L. Barnes, a road master for the railroad, testified that, in addition to operating motor cars, welders are required to operate "high rail" pickup trucks.[5] These vehicles are used to transport the welder, his helper and their equipment to various job locations. A welder's equipment weighs between 160 and 230 pounds and consists of a rail grinder, hose, a tool box, acetylene torch and tanks, including oxygen. This equipment must be loaded and unloaded daily. The majority of the welder's time is spent working in and around switching areas with a helper, as well as working with crews. The welder frequently works in an area far removed from medical assistance (ofttimes up to 10 miles).

Mr. L. G. Tieman, an assistant division manager for the petitioner, repeated much of what was said by Barnes and Pritzl and added that welders are required to work on bridges as high as 30 to 50 feet. He also testified that the rail grinders used by the welders possessed, in essence, one moving part, the grinding wheel, covered by a guard.

---

[4] A "motor car" is a gas powered vehicle equipped with steel wheels for use only upon the rails. It is operated by one person and capable of reaching speeds of 35 to 40 m.p.h.

[5] A "high rail" pickup truck is a standard pickup truck equipped with steel wheels attached to its front and rear. These wheels can be lowered so as to guide the pickup along the rails. A high rail pickup is propelled over the rails by its rubber tires and is capable of reaching speeds of 65 m.p.h. on the rails and can be operated on ordinary roads.

Mr. R. L. Wilson, an assistant vice president of personnel services for the railroad testified that welders must on occasion stop working on a track to allow a train to pass. He stated that in such instances the welder and his helper are standing on opposite sides of the track within a few feet of the train for 10 to 15 minutes while inspecting the passing cars.

Dr. Thomas Davison, petitioner's medical director, a subspecialist in occupational medicine and a board certified specialist in preventive medicine, and Dr. Francis J. Millen, a neurologist with a subspecialty in epileptology, testified for the petitioner with respect to Pritzl's capacity to safely perform the duties of a welder for the railroad.

Dr. Davison, the railroad's medical director, has the ultimate responsibility to determine whether an employee should remain on the railroad's employment rolls or be discharged for medical reasons. He decided after consultation that Pritzl's condition of epilepsy disqualified him for further employment as a welder. Dr. Davison testified that his decision was mandated by rule 9 of the railroad's "Rules and Regulations Governing the Examination and Re-Examination of Employes" because welders are required to operate "motor cars" and "high rail" pickup trucks. Rule 9, in part, provides:

"No one in train, engine or yard service, and no one who operates a motor car, motor vehicle, or power driven work equipment, as all or even a part of his duties, and who is subject to or has a history of epileptic seizures (both Grand Mal attacks and/or Petit Mal attacks), . . . shall be permitted to return to such service or duties at any time."

Accordingly, he testified that once a welder is determined to be an epileptic, rule 9 prohibits his return to work for the petitioner as long as the condition of epilepsy remains unchanged. He stated that the basis for the rule 9 exclusion was the potential hazards involved in allow-

ing an epileptic to operate motorized vehicles and that his sole concern in disqualifying Pritzl for employment as a welder was the danger and possibility that he might suffer an epileptic seizure while on the job and cause injury to himself and/or others. Further, he testified that the working environment Pritzl would encounter in the future as a welder would be hazardous to his health and/or the health of his fellow employees.

Dr. Millen described the characteristics and effects of a grand mal epileptic seizure. He testified that a person who experiences a grand mal seizure will suddenly lose consciousness, fall to the ground, stiffen up and suffer an uncontrolled spasm-like jerking of arms and legs. The loss of consciousness usually lasts for a period of two-fifteen minutes. After the seizure the epileptic regains consciousness and experiences what is termed a "post seizure state." During this time he is often confused and unaware of his surroundings. The post seizure state may last for an indefinite period of time of hours, or even a day. A person not on anti-epileptic medication may receive a pre-warning of the seizure's onset, whereas a patient taking medication is less likely to receive a warning. Epileptic seizures experienced by persons taking anticonvulsive drugs ofttimes will be milder than one failing to ingest the same. One of the primary differences in the severity of epileptic seizures suffered by persons on medication as compared with the convulsions of epileptics who are not taking seizure control medicine is that the former may not lose consciousness or awareness of their environment or surroundings.

Dr. Millen also testified that a person who has experienced two grand mal type epileptic seizures would be exposed to danger in the handling of a welding torch and in the operation of "motor cars" and pickup trucks. However, he qualified this remark noting that the danger to an epileptic and to those around him would be reduced

if there was someone working with him who had prior knowledge of the epileptic's seizure disorder and was in a position to come to his assistance. Further, Dr. Millen stated that he would recommend that Pritzl not work in an environment that presents a possibility of bodily injury to him or to others should a seizure occur. In this regard, Dr. Millen stated that it would be ill advised to allow Pritzl to work around mobile equipment (trains) or machinery that moves back and forth in close proximity to his body, unprotected electrical devices, scaffolds, ladders, or elevated structures without railings that could prevent his falling, should he suffer a seizure and lose consciousness.

Dr. Davison and Dr. Millen testified that there is no cure for epilepsy but that anticonvulsive agents are medications that control the onset and severity of the seizure. Both doctors also testified that epileptics may experience what is termed "breakthrough" seizures (epileptic convulsions that take place while the patient continues to ingest antiepileptic medication). Also, Davison stated there is a greater danger of recurring seizures should the epileptic fail to take his medication. However, Dr. Millen testified that 70 to 90 percent of all epileptics regularly taking anticonvulsive drugs do not suffer recurrent episodes and that the likelihood of a breakthrough seizure decreases the longer the period the patient on medication fails to experience an epileptic convulsion. But, the possibility of a breakthrough seizure is never entirely eliminated.

The complainant, Pritzl, failed to offer medical testimony at the hearing. However, the cross-examination of Dr. Davison established that four doctors, Hoon, Senty, McRoberts and Houfek, the last of whom was a neurologist, had examined Pritzl on behalf of the railroad and that each concurred in the opinion expressed by Pritzl's physician, Dr. Keller, that Pritzl was capable of returning to his usual work as a welder for the petitioner on

April 24, 1972. The reason given for this opinion was that Pritzl had not suffered a seizure since he began taking antiepileptic medication some six months prior to April 24, 1972.[6] Dr. Davison rejected those opinions because, as previously noted, it was his opinion that allowing an epileptic to return to the duties and responsibilities of a welder for the railroad would present a hazard not only to the safety of such person but also his fellow employees.

Other evidence adduced at the hearing included the fact that Pritzl had been granted a restricted driver's license on or about April 24, 1972, and that the restrictions had been removed as of the date of the hearing, March 18, 1975, pursuant to sec. 343.09, Stats. Under this statute a person suffering from epilepsy may be granted a driver's license if the Department of Transportation determines that it would not be a "hazard to public safety to permit the applicant to operate a motor vehicle." *Id.* This determination is made upon the statement of a physician who examined the epileptic and who certifies that the applicant is "under medication and free from seizures while under medication" with the approval of the secretary of transportation. *Id.*

On February 11, 1977, the hearing examiner made findings of fact, conclusions of law, issued a proposed order and recommended decision that was adopted by the Commission in its entirety on September 16, 1977. The order provided as follows:

"1. That Respondent [petitioner] cease and desist from disqualifying Complainant [Pritzl] from performing the duties of a welder on the basis of handicap.

[6] The opinions of Drs. Senty, McRoberts and Houfek were expressed in a letter authored by Dr. Keller. This letter was one of the complainant's exhibits admitted into evidence pursuant to a stipulation of the petitioner's counsel. Dr. Hoon's letter was received in evidence.

"2. That within ten days from the Commission's final order herein, Respondent shall restore Complainant to his job as a welder with all rights, privileges, benefits, seniority and remuneration he would have had if Respondent had not disqualified him. Respondent may require any reasonable medical examinations and tests before the resumption of Complainant's employment and periodically thereafter to insure the safety of Complainant and others with whom he may work. Those examinations and tests shall be those that may be necessary to reasonably monitor Complainant's condition in the sound judgment of the appropriate independent medical specialists.

"3. That within ten days of the Commission's final order herein Respondent shall make Complainant whole for any loss of pay or other benefits suffered by reason of the unlawful disqualification of him, by paying to Complainant a sum of money equal to that which he normally would have earned since April 24, 1972,[7] the

---

[7] At the hearing the parties stipulated that Mr. Pritzl was a Track Welder represented by the Boilermakers Organization of the Federated Shop Crafts and that Pritzl's back pay would be calculated according to the rates of pay for Track Welders represented by that organization. The following wage and increase schedule was introduced into evidence at the hearing for this purpose:

| Date of Negotiated Increase | Increase Negotiated | Resultant Rate of pay |
| --- | --- | --- |
| 1-1-74 | 4% | $5.7800 per hour |
| 4-1-73 | 25 cents per hour | 5.5577 per hour |
| 10-1-72 | 5% | 5.3077 per hour |
| 4-1-72 | 5% | 5.0550 per hour |
| 10-1-71 | 5% | 4.8143 per hour |
| 4-1-71 | 15 cents per hour | 4.5850 per hour |
| 1-1-71 | 10 cents per hour | 4.4350 per hour |
| 8-1-70 | 4 cents per hour | 4.3350 per hour |
| 4-1-70 | 4 cents per hour | 4.2950 per hour |
| 2-19-70 | 7 cents per hour | 4.2550 per hour |
| 1-1-70 | 5% | 4.1850 per hour |
| 9-1-69 | | 3.8857 per hour |

The final total of the back pay award is not contained in the record.

date he was certified by his physician as being able to safely return to work, to the date of his reinstatement, less any statutory setoffs."

The Commission's findings of fact relevant to this appeal provide:

"1. Since April 24, 1972, Respondent has disqualified Complainant from returning to work as a welder for Respondent on the ground that as an epileptic, he could not safely perform his duties.

". . .

"3. Complainant was disqualified under a rule of Respondent which required disqualification of an epileptic without any analysis of the employee's medical history, his medical management, or whether his duties include any proscribed by medical restrictions for reasons of safety.

". . .

"6. Respondent's rule is unreasonable in its failure to consider whether Complainant, with his affliction and the required restrictions, has the ability to undertake the job related responsibilities of his employment. Complainant's handicap is not reasonably related to his ability to adequately undertake the job related responsibilities of a welder for Respondent."

In light of these findings, the Commission concluded in pertinent part that:

"3. Complainant has proven by a preponderance of the evidence that Respondent disqualified him from resuming his duties as a welder on the basis of a handicap.

"4. Respondent discriminated against Complainant in disqualifying him on the basis of handicap in violation of the Wisconsin Fair Employment Law."

The railroad, pursuant to sec. 111.37 and ch. 227, Stats., petitioned the circuit court for review of the decision and order of the Commission. The circuit court, on June 15, 1978, rendered judgment affirming the Commission. The court of appeals affirmed the judgment

of the circuit court and the railroad petitions this court for review of the decision of the court of appeals.

*Issue*

Is there substantial evidence in the record to support the conclusion of the trial court that the railroad discriminated against Pritzl on the basis of handicap in contravention of sec. 111.325, Stats., in disqualifying him for employment as a welder?

The railroad claims that its termination of Pritzl's employment was justified under the exception to unlawful handicap discrimination set forth in sec. 111.32(5) (f), Stats. Sec. 111.32(5) (f) provides:[8]

"(f) The prohibition against discrimination because of handicap does not apply to failure of an employer to employ or to retain as an employe any person who *because of a handicap is physically or otherwise unable*

---

[8] The statute set out in the opinion is the 1973 version of sec. 111.32(5)(f), Stats. This statute was amended by ch. 275, sec. 18, Laws of 1975, effective May 27, 1976. As amended, the section in relevant part provides:

"(f) It is discrimination because of handicap:

"1. For an employer, . . . to bar or to terminate from employment, . . . any individual . . . unless such handicap is reasonably related to the individual's ability adequately to undertake the job-related responsibilities of that individual's employment . . . ."

The effective date of the amended sec. 111.32(5)(f) fell between the date of the hearing in this case, March 18, 1975, and the date the Commission adopted the hearing examiner's recommended decision, September 16, 1977. The petitioner contends that the hearing examiner applied the amended version of sec. 111.32(5)(f) to this case. The record is unclear on this point. However, the circuit and appellate courts applied sec. 111.32(5)(f) as it existed in 1973. Since the petitioner's alleged act of discrimination occurred while the 1973 provision was in effect and thus Pritzl's right of action accrued under this provision, sec. 111.32(5)(f) as amended is inapplicable. *Dairy Equipment Co. v. ILHR Dept.*, 95 Wis.2d 319, n. 8, 331–32, 290 N.W.2d 330 (1980). Further reference in this opinion to sec. 111.32(5) (f) is to the 1973 provision.

*to efficiently perform, at the standards set by the employer, the duties required in that job.* An employer's exclusion of a handicapped employe from life or disability insurance coverage, or reasonable restriction of such coverage, shall not constitute discrimination." (Emphasis supplied.)

The language emphasized in the above quotation of sec. 111.32(5)(f), Stats., creates what has been termed a "future hazards" exception to handicap discrimination in employment. The "future hazards" exception was first announced in *Chicago, M., St. P. & P. RR. Co. v. ILHR Dept.*, 62 Wis.2d 392, 399, 215 N.W.2d 443 (1974), and articulated in *Bucyrus-Erie Co. v. ILHR Dept.*, 90 Wis.2d 408, 280 N.W.2d 142 (1979).

In *Bucyrus-Erie Co., supra*, this court stated:

*"The point is that we believe safety with regard to both the handicapped employee's future health and well-being and others is a factor to be accorded some recognition in cases arising under sec. 111.32(5)(f), Stats. 1973.* The ability to efficiently perform embraces more than the physical strength and dexterity required to adequately perform at the moment of application for employment. *It embraces the ability to perform without a materially enhanced risk of death, or serious injury to the employee or others in the future and the statute must be so construed.* We do not believe that the legislature when proscribing discrimination against those physically handicapped intended to force an employer into the position of aiding a handicapped person to further injury, aggravating the intensity of the handicap or creating a situation injurious to others. Such an interpretation would compromise not only the best interests of the handicapped but all concerned. It is important that each case be individually evaluated and decided upon the evidence presented by both parties." (Emphasis supplied.) *Id.* at 423.

The petitioner claims that it has satisfied the "future hazards" exception based upon the testimony of Drs.

Davison and Millen. These doctors testifying to a reasonable degree of medical certainty stated that employment of Pritzl as a welder by the petitioner would be hazardous to his health and safety as well as the safety of other employees. Further, the railroad contends that no contrary evidence was offered and that "[g]iven this evidentiary record, there is no substantial evidence to support a finding that Pritzl could efficiently perform at the standards set by the employer the duties required [of a welder]."

The Commission, on the other hand, contends that its finding is supported by substantial evidence. The respondent points to the letters from Dr. Keller and Dr. Hoon (received in evidence pursuant to a stipulation) containing the opinions of Drs. Hoon, Houfek, Keller, McRoberts and Senty that Mr. Pritzl was capable of returning to work as a welder for the railroad six months after his seizure on October 24, 1971 and claims that this evidence contradicted the testimony of Drs. Davison and Millen.

The Commission found:

"6. Respondent's rule is unreasonable in its failure to consider whether Complainant, with his affliction and the required restrictions, has the ability to undertake the job related responsibilities of his employment. Complainant's handicap is not reasonably related to his ability to adequately undertake the job related responsibilities of a welder for Respondent."

Thus, it is evident that the Commission found that the railroad failed to establish the future hazards exception implicit in the language of sec. 111.32(5)(f) and rejected the testimony of Drs. Millen and Davison that the continued employment of Pritzl would be hazardous to himself or others. The finding of capability to perform job related responsibilities at the standard set

by the employer embraces a finding of ability to perform such duties without creating a "materially enhanced risk of death, or serious bodily injury to the employee [Pritzl] or others in the future. . . ." *Bucyrus-Erie Co., supra* at 423.

A finding that the employer has failed to establish the future hazards exception is a finding to which the "substantial evidence" standard of review set out in sec. 227.20(6), Stats., applies. *Dairy Equipment Co. v. ILHR Dept.,* 95 Wis.2d 319, 290 N.W.2d 330 (1980) ; *Bucyrus-Erie, supra.* Sec. 227.20(6), Stats., provides:

"(6) If the agency's action depends on any fact found by the agency in a contested case proceeding, the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact. The court shall, however, set aside agency action or remand the case to the agency if it finds that the agency's action depends on any finding of fact *that is not supported by substantial evidence in the record.*" (Emphasis supplied.)

Thus, the test on review is whether the Commission's finding is supported by substantial evidence in the record.

Substantial evidence has been defined to be "that quantity and quality of evidence which a reasonable man could accept as adequate to support a conclusion," *Robertson Transport Co. v. Public Service Comm.,* 39 Wis. 2d 653, 658, 159 N.W.2d 636 (1968), or " '. . . such relevant evidence as a reasonable mind *might* accept as adequate to support a conclusion.' " *Gateway City Transfer Co. v. Public Service Comm.,* 253 Wis. 397, 405, 34 N.W. 2d 238 (1948). *See also: Bell v. Personnel Board,* 259 Wis. 602, 608, 49 N.W.2d 889 (1951).

Moreover:

"An agency determination being reviewed under Chapter 227 will not be overturned because it is against the great weight and clear preponderance of the evidence. *City of Superior v. ILHR Department,* 84 Wis.2d 663, 666, 267 N.W.2d 637 (1978). Rather, the agency's decision may be set aside by a reviewing court only when, upon an examination of the entire record, the evidence, including the inferences therefrom, is found to be such that a reasonable person, acting reasonably, could not have reached the decision from the evidence and its inferences. *Bucyrus-Erie Co. v. ILHR Department, supra* at 418; *Holtz & Krause, Inc. v. DNR,* 85 Wis.2d 198, 204, 270 N.W.2d 409 (1978)." *Hamilton v. ILHR Dept.,* 94 Wis.2d 611, 618–19, 288 N.W.2d 857 (1980).

In *Bucyrus-Erie Co., supra,* this court described the burden an employer must meet to come within the future hazards exception as delineated in sec. 111.32(5)(f), Stats.:[9]

"If the evidence shows that the applicant has a present ability to physically accomplish the tasks which make up the job duties, the employer must establish to a *reasonable probability* that because of the complainant's physical condition, employment in the position sought would be hazardous to the health or safety of the complainant or to other employees or frequenters of the place of employment." (Emphasis supplied.) *Id.* at 424.

Under the standard of review as set forth in ch. 227, the question presented is whether reasonable men could, on the basis of the relevant evidence, accept the conclusion that the petitioner failed to satisfy the future hazards exception, i.e., prove that continued employment of Pritzl as a welder would create a reasonable probability of hazard to Pritzl or others.

[9] The *Bucyrus-Erie* standard was quoted with approval in *Dairy Equipment Co., supra.*

The relevant and undisputed testimony in this case demonstrates that 70 to 90 percent of the epileptics under control medication never suffer recurrent seizures and that Pritzl, as of April 24, 1972, the date the petitioner terminated his employment, had not experienced a seizure since after his second epileptic convulsion on October 24, 1971, when he began taking anticonvulsive drugs.[10] Thus, there was considerable evidence that Pritzl's seizure disorder was under control as of the date he was disqualified for further employment as a welder and therefore it was unlikely that he would experience another seizure episode during the course of his employment. Hence, we conclude that reasonable men could accept the Commission's finding that the railroad failed to establish that Pritzl's employment as a welder would be hazardous to Pritzl's health or safety or the health and safety of others, solely because of his handicap. We therefore hold that there was substantial evidence in the record to support the Commission's finding that Pritzl's seizure disorder did not present a reasonable probability of hazard on the date of his disqualification, April 24, 1972.

The railroad contends that the court of appeals incorrectly applied the reasonable probability burden set out in *Bucyrus-Erie Co., supra.* The court of appeals held that the Commission's finding was supported by substantial evidence, stating:

"The [medical testimony] is sufficient basis to conclude that appellant has not shown a reasonable probability that Mr. Pritzl will suffer a future *seizure.* It is possible that a seizure will occur, with or without medication; but a possibility does not arise to a prob-

[10] It should also be noted that the undisputed testimony established that Pritzl had not experienced an additional seizure episode as of the date of the hearing, March 18, 1975.

ability. The Commission could also conclude that appellant [railroad] has not shown a reasonable probability that Mr. Pritzl, if he has a seizure, will *injure* himself or others." (Emphasis supplied, *supra*, n. 1 at 471.)

The essence of the railroad's claim is that the court of appeals misapplied the *Bucyrus-Erie* rule because it emphasized the reasonable probability of *injury* or *seizure*. It claims that this likelihood is not the same as that of the reasonable probability of *hazard* which is the standard set out in *Bucyrus-Erie*. The petitioner's claim lacks merit for a hazard would not be presented unless Pritzl experienced a seizure during the course of employment, and thus in the context of this case the reasonable probability of a hazard is the same as the likelihood of a seizure.

The petitioner makes two additional claims, both of which are related to facts that came into being *long after* the proceedings before the hearing examiner on March 18, 1975 terminated. On January 18, 1979, while the appeal was pending in the court of appeals, the petitioner noticed a motion in the circuit court, pursuant to sec. 806.07(1)(b), (h), Stats., for relief from judgment in the ch. 227, review action. The affidavit in support of the motion quoted from a deposition given by Dr. Keller on October 25, 1978 in a lawsuit brought by Pritzl in Manitowoc county. In this deposition Keller stated that Pritzl had not been faithful in taking his medication and had suffered two epileptic seizures, one in November of 1977 and a "breakthrough" seizure in June of 1978.[11] Also offered in support of the motion was a copy of Pritzl's driving record showing that his driver's license had been cancelled on March 21, 1978 because he failed to appear for a requested physical examination, pursuant to sec. 343.09. The circuit court

[11] The exhibits attached to the railroad's motion for relief from judgment indicate that Pritzl also may have experienced a seizure around the end of September or beginning of October, 1977.

denied the motion and the railroad moved the court of appeals for "relief from judgment or the taking of additional testimony" on the grounds of newly discovered evidence and in the interest of justice under sec. 806.07 (1)(b) and (h).[12] The court of appeals held that it had no power to grant relief from judgment pursuant to sec. 806.07, relying on *Wisconsin Environmental Decade v. Public Service Commission,* 79 Wis.2d 161, 255 N.W.2d 917 (1977), for the proposition that statutory remedies pertaining to civil procedure cannot be used to supplement a ch. 227, administrative review. Additionally, the railroad asks this court to exercise its power of discretionary reversal under sec. 751.06,[13] claiming

---

[12] Sec. (Rule) 809.12, Stats., specifically provides for motions to the court of appeals for relief pending appeal under sec. 808.07, and sec. 808.07(2)(a)(4) permits the appellate court to grant relief pending appeal, pursuant to sec. 806.07. Sec. 806.07(1)(b) and (h) provides:

"806.07 **Relief from judgment or order.** (1) On motion and upon such terms as are just, the court may relieve a party or legal representative from a judgment, order or stipulation for the following reasons:

". . .

"(b) Newly-discovered evidence which entitles a party to a new trial under s. 805.15(3);

". . .

"(h) Any other reasons justifying relief from the operation of the judgment."

Sec. 805.15(3) provides:

"(3) NEWLY-DISCOVERED EVIDENCE. A new trial shall be ordered on the grounds of newly-discovered evidence if the court finds that:

"(a) The evidence has come to the moving party's notice after trial; and

"(b) The moving party's failure to discover the evidence earlier did not arise from lack of diligence in seeking to discover it; and

"(c) The evidence is material and not cumulative; and

"(d) The new evidence would probably change the result."

[13] "751.06 **Discretionary reversal.** In an appeal in the supreme court, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any

that the facts contained in its affidavit in support of the motion for relief pending appeal demonstrate "that justice has miscarried and the real controversy has not been fully tried."

The basis of the railroad's motion in the court of appeals was that the seizures experienced by Pritzl in 1977 and 1978 and the cancellation of Pritzl's driving license in 1978 constituted newly discovered evidence sufficient to require a new trial under sec. 805.15(3), Stats. These facts are not relevant to the case under review as they relate only to Pritzl's ability to efficiently perform a welder's duties according to the railroad's standards as of 1977 or 1978, and not to Pritzl's capacity to work as a welder on the date of his disqualification, April 24, 1972. In view of the Commission's order allowing the railroad to "require any reasonable medical examinations and tests before the resumption of Complainant's [Pritzl's] employment . . . ," the fact that Pritzl suffered two additional seizures would be relevant to Pritzl's return to work. Thus, these facts are not newly discovered evidence as to this case. Therefore, we hold that the appellate court did not err in denying the petitioner's motion for relief from judgment, pursuant to secs. 808.07 and 806.07(1)(b) and (h).

The railroad claims that this court should exercise its discretionary power of reversal under sec. 751.06, Stats. We decline to do so as this court in previous cases has held that reviewing courts have no powers with respect

reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record, and may direct the entry of the proper judgment or remit the case to the trial court for the entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice."

to decisions and orders of administrative agencies except as set forth in ch. 227, and thus, sec. 751.06 entitled "Discretionary reversal" is not applicable to a judicial review under ch. 227. *Monahan v. Dept. of Taxation,* 22 Wis.2d 164, 171, 125 N.W.2d 331 (1963) ; *Wagner v. Industrial Comm.,* 273 Wis. 553, 567d, 79 N.W.2d 264, 80 N.W.2d 456 (1956).

*By the Court.*—The decision of the court of appeals is affirmed.