DANIEL JANSEN, PLAINTIFF–APPELLANT, v. FOOD CIRCUS
SUPERMARKETS, INC., DEFENDANT–RESPONDENT.

Argued October 13, 1987—Decided May 25, 1988.

364

*Stephen B. Hunter* argued the cause for appellant (*Klausner & Hunter,* attorneys).

*Gary E. Fox* argued the cause for respondent (*Ansell, Fox, Zaro & McGovern,* attorneys; *Patricia F. Stefanile,* on the brief).

*Lynn B. Norcia,* Deputy Attorney General, argued the cause for *amicus curiae* Division on Civil Rights (*W. Cary Edwards,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Deputy Attorney General, of counsel).

*Louis Bucceri* submitted a brief on behalf of *amicus curiae* Epilepsy Foundation of America (*Bucceri & Pincus,* attorneys).

*Linda D. Headley,* Assistant Deputy Public Advocate, submitted a brief on behalf of *amicus curiae* Epilepsy Foundation of New Jersey (*Alfred A. Slocum,* Public Advocate, attorney).

The opinion of the Court was delivered by

POLLOCK, J.

On this appeal, the basic issue is whether the employer, Food Circus Supermarkets, Inc. (Food Circus), reasonably concluded that the epilepsy of its former employee, Daniel Jansen, presented a materially enhanced risk of harm to him or other employees. Acting on that conclusion, Food Circus terminated Jansen's employment. The Chancery Division found that the employer reasonably reached that conclusion, and the Appellate Division affirmed. 214 *N.J.Super.* 51 (1986). We granted certification, 107 *N.J.* 107 (1987), and now reverse and remand to the Chancery Division. We find that the employer did not act reasonably in concluding that Jansen's epilepsy constituted a danger to him or his co-employees. We hold further that in a case involving handicap discrimination the employer bears the burden of proving that "the handicap reasonably precludes the performance of the particular employment." *N.J.S.A.* 10:5–4.1; *see N.J.S.A.* 10:5–2.1 (stating that the employer may terminate "the employment of any person who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment").

–I–

An estimated 2,135,000 Americans suffer from epilepsy. Nearly half that number eliminate or "control" epileptic seizures through medication; for another 30%, medication significantly reduces the number of seizures. *See Interviewing Guides for Specific Disabilities: The Epilepsies,* United States Department of Labor, Employment and Training Administration (1984). Despite recent advances in knowledge and treatment of epilepsy, it remains a misunderstood handicap. The term "epilepsy" [1] itself evokes stereotypical fears that perpetu-

---

[1]Epilepsy is defined:

A recurrent paroxysmal disorder of cerebral function characterized by sudden, brief attacks of altered consciousness, motor activity, or sensory

ate discrimination against its victims in all aspects° of life, including employment. As the United States Supreme Court recently noted, "[a] review of the history of epilepsy provides a salient example that fear, rather than the handicap itself, is the major impetus for discrimination against persons with epilepsy." *School Bd. of Nassau County, Fla. v. Arline*, 480 *U.S.* 273, —— n. 13, 107 *S.Ct.* 1123, 1129 n. 13, 94 *L.Ed.*2d 307, 319 n. 13 (1987) (quoting brief for Epilepsy Foundation as amicus curiae 5–14).

Epileptics are not all alike. Some may suffer one or two seizures in a lifetime; others suffer them more frequently. The nature, timing, and frequency of seizures vary from one epileptic to another. See Interviewing Guides for Specific Disabilities: The Epilepsies, supra. Accordingly, epileptics must be viewed not as fungible members of a class, but as individuals.

Daniel Jansen suffers a mild form of epilepsy known as psychomotor or temporal lobe epilepsy, a form that causes "partial, complex seizures." The seizures are called "partial" because they involve part of the brain, and "complex" because they are associated with loss or impairment of consciousness. Although he has suffered from seizures since he was four, Jansen, who is now 39 years old, was not diagnosed as an epileptic until 1978. Four years earlier, on July 15, 1974, he

---

phenomena. * * *. [Taber's Cyclopedic Medical Dictionary (15th ed. 1985) at 562.]

Epilepsy is more properly viewed not as a disease, but as a symptom. J. Walton, *Brain's Diseases of the Nervous System* 609 (9th ed. 1985). The symptoms manifest themselves as seizures, which are the outward signs of a temporary and sudden disturbance of the electrical activity of the brain. As one leading authority states:

It must be also accepted that virtually every individual is potentially epileptic if the provocation, whether physical or pharmacological, is sufficient * * *. It follows that there is a continuum between the epileptic and normal populations varying between the majority in whom substantial provocation is needed to produce a fit and the severe epileptics who have frequent attacks without evident cause. The margin between the two populations is clearly indistinct. [*Id.* at 610.]

began working as a meat cutter for Food Circus, where he worked without incident for eight years. His work entailed the use of butcher knives and other cutting tools, including a band saw. Before working for Food Circus, Jansen had graduated from high school; served two years as a truck driver in the Marines, from which he received an honorable discharge; and held a job as a warehouseman. Since 1978, Jansen has controlled his seizures through the use of prescribed drugs. In 1980, he suffered his only generalized seizure, which occurred when he stopped taking one form of medication because of its side effects. In September 1980, Jansen started taking a new medication. Between that date and July 1982, he experienced six to ten seizures, all of which occurred shortly after he awoke, and none of which occurred at work.

For its part, Food Circus has an affirmative policy of hiring the handicapped, and currently employs two other epileptics, one of whom suffered a seizure at work but is still employed. Food Circus cooperates with community-based organizations to hire the retarded and emotionally disadvantaged, and has received an award for the training and employment of the handicapped. On learning of Jansen's epilepsy, Food Circus continued his employment without questioning his ability to work as a meat cutter until the events of July 17, 1982.

On that date, the meat department manager, Dominick Iannuzzi, was instructing Jansen on cutting top round steaks. While Jansen was cutting steaks with a large steak knife, he suffered a seizure in which he stopped and stood staring, with the knife in his right hand. When Jansen did not respond to inquiries, Iannuzzi removed the knife from Jansen's hand. Jansen sat on the butcher's block, noticed another employee, and said, "this is it, it's all over," and walked out of the room. Found in the restroom, Jansen seemed dazed and did not remember the incident.

The store manager sent Jansen home and told him not to return without a doctor's letter of approval. Four days later,

Jansen returned with a note from his treating neurologist, Dr. Silbert, stating that Jansen's seizures "have been under fair control on medication," that he had "increased [Jansen's] medication so as to help prevent recurrence of such seizures in the future," and that Dr. Silbert expected "to be able to achieve better seizure control for Mr. Jansen."

For the next two days, Jansen performed his tasks without incident, except for some unfortunate remarks to a co-employee, John Snel, on July 22. Regarding this incident, Snel testified at trial:

> [Jansen] explained to me well I guess this is it. I guess I am going to lose my job. But he said I think I am going to go trapping in Oregon. But before I go I am going to take six people with me. While he sat there he sat there with an open hand and a clenched fist and hitting his hand over and over again.

According to Jansen, his remarks were misconstrued; he intended not to threaten, but only to communicate that he was thinking of taking six people with him to Oregon.

On July 23, when the meat department employees learned that the July 17th incident was the result of a psychomotor seizure, they complained to the store manager that they feared for their own safety and did not want to work with Jansen. In the interim, Iannuzzi apparently circulated among the employees, including Snel, excerpts from an unidentified medical dictionary that allegedly described psychomotor epileptics as having homicidal tendencies. This misinformation spread among the workers, and the manager told Jansen to leave and not to return until further notice. On August 5, a Food Circus vice president advised Jansen he was suspended "pending examination by doctors of our choosing to determine your competency, from a medical standpoint, to return to work."

Food Circus arranged for medical examinations by Dr. Whalen, a neurosurgeon, and by Dr. Corral, a psychiatrist. Dr. Corral found no psychopathology, but concluded: "I still think, as I did in my general impression of Mr. Jansen, is that considering the kind of neurological that he has, impresses me as risky and dangerous to perform the task that a meat cutter

has to do." Dr. Whalen performed a complete physical and neurological examination and sent a report, concluding:

Thusfar, he has not been really adequately controlled by medication, but even if such control is obtained, one can never state with certainty that such a patient may not have another attack in spite of adequate medication. For these reasons, I think that such patients, including Mr. Jansen, need to be protected, as well as other people, from the effects of such seizures, and I think, therefore, that any occupational activity in which the patient might injure himself or others, were he to have a seizure, should be avoided. Therefore, as I indicated in my initial report, I think that the occupation of butcher and meat cutter entailing as it does, access to knives and other dangerous instruments, is inappropriate and potentially hazardous in this instance.

Based on the two doctors' reports, Food Circus terminated Jansen's employment, stating: "The reports of our Doctors and their final conclusions do not certify you to be reinstated in your position as a butcher."

Within five weeks, Jansen obtained letters from three physicians certifying that he could work as a meat cutter without endangering himself or others. A neurologist, Dr. Masland, who examined Jansen and reviewed his medical records, stated:

This man clearly suffers from psychomotor seizures. However, they occurred with relative infrequency and with only one exception have occurred during the early morning hours.

Individuals with this type of seizure, if let alone, with the occurrence of an attack, will recover promptly and without hazard to themselves or others. This man has worked at his present position for 8 years in spite of having had this condition. There is nothing to indicate that there is any undue hazard in his employment.

Dr. Rhee, one of Jansen's treating neurologists, also attested to Jansen's ability to work as a butcher, stating:

It is my professional opinion that his condition is under good control with only one type of medication (Tegretol) at present and I see no hazard on him in working as meat cutting personnel which has been for the last 8 years without any problems since he is under very close medical follow-ups including medications and EEG follow-ups.

He is very reliable in terms of compliance and medical follow-ups.

I feel strongly again that there is no work hazard in his condition because of the reasons mentioned above.

Dr. Silbert wrote in another letter that Jansen "may engage in activity including driving a motor vehicle and performing his job as a meat cutter."

Nonetheless, Food Circus refused to reinstate Jansen as a meat cutter. In March 1983, Food Circus offered Jansen another position, but he declined the offer. Instead, Jansen filed an administrative complaint with the Division on Civil Rights and also filed a union grievance. Later, he withdrew those complaints and commenced an action in the Chancery Division, alleging he was fired in violation of *N.J.S.A.* 10:5-4.1 [2] because he was an epileptic.

Following a six-day trial, the Chancery Division dismissed the complaint, finding that Jansen "failed to meet his burden of proving discriminatory termination." Relying on Dr. Whalen's report that Jansen's epilepsy "has not been really adequately controlled by medication" and that Jansen "might injure himself or others, were he to have a seizure," the trial court concluded Jansen was fired

because, as an epileptic who could have another seizure at work, he was the source of fear among fellow employees of potential harm to themselves and concern on the part of Food Circus of harm to himself or to fellow employees. The work environment [of a meat cutter] was obviously one fraught with potential harm should a seizure occur while in the act of cutting or hacking or operating a hand saw [sic].

The Appellate Division affirmed, agreeing that Food Circus "reasonably arrived at" the conclusion that Jansen's epilepsy "reasonably precluded" him from performing the duties of a meat cutter. 214 *N.J.Super.* at 61. In reaching that conclusion, the Appellate Division construed Dr. Whalen's testimony as stating that it was reasonably probable, not merely possible, that Jansen would suffer another psychomotor seizure. This circumstance, the Appellate Division concluded, "reasonably

---

[2]As amended in 1978, *N.J.S.A.* 10:5-4.1 provides:

All of the provisions of the act to which this act is a supplement shall be construed to prohibit any unlawful discrimination against any persons because such person is or has been at any time handicapped or any unlawful employment practice against such person, unless the nature and extent of the handicap reasonably precludes the performance of the particular employment.

precludes Jansen from the position as a meat cutter." *Ibid.*
The Appellate Division reasoned further:

Under the circumstances in this case, the burden was upon Food Circus to go forward with proofs to rebut a presumption of undue discrimination by articulating some legitimate, non-discriminatory reason for Jansen's termination. However, we note that the ultimate burden of persuading the trier of fact that Food Circus intentionally discriminated against him remained upon Jansen; only the burden of going forward shifted. [*Id.* at 60 (citation omitted).]

The Appellate Division recognized that "unreasonable and unfounded fears of coemployees is not an exception to an employer's obligation not to discriminate against a handicapped person." *Id.* at 57. The court also stated that the appropriate test to determine the likelihood of future seizures is not whether such a seizure is possible, but whether it is reasonably probable. *Id.* at 60–61. Neither the Chancery Division nor the Appellate Division, however, addressed the question whether future seizures, even if their occurrence was reasonably probable, would probably result in harm to Jansen or his co-employees.

–II–

The clear public policy of this State is to eliminate discrimination from the work place. *Fuchilla v. Layman,* 109 *N.J.* 319, 334 (1988). Expressing that policy in the Law Against Discrimination (the Law), the Legislature declared: "[D]iscrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State." *N.J.S.A.* 10:5–3. This opinion is concerned with the extent to which that policy applies to discrimination against the handicapped.

In the Law, the Legislature has declared:

Nothing contained in this act * * * shall be construed * * * to prohibit the establishment and maintenance of bona fide occupational qualifications * * * nor to prevent the termination or change of the employment of any person who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment * * *. [*N.J.S.A.* 10:5–2.1.]

Consistent with that declaration, the Law disapproves employment discrimination against the handicapped "unless the nature

and extent of the handicap reasonably precludes the performance of the particular employment." *N.J.S.A.* 10:5–4.1.

The import of the Law is that the handicapped should enjoy equal access to employment, subject only to limits that they cannot overcome. *Andersen v. Exxon Co.,* 89 *N.J.* 483, 496 (1982). Because of the limits imposed by a handicap, the Law must be applied sensibly with due consideration to the interests of the employer, employee, and the public. *See id.* As we have previously written, "[u]nder both [*N.J.S.A.* 10:5–2.1 and *N.J.S.A.* 10:5–4.1], an employer found to have reasonably arrived at an opinion that a job applicant cannot do the job, either because the applicant is unqualified or because of a given handicap, cannot be found liable for discrimination against that applicant." *Andersen, supra,* 89 *N.J.* at 497; *accord Panettieri v. C.V. Hill Refrigeration,* 159 *N.J.Super.* 472, 473, 487 (App.Div.1978). The two provisions leave the employer with the right to fire or not to hire employees who are unable to perform the job, "whether because they are generally unqualified or because they have a handicap that in fact impedes job performance." *Andersen, supra,* 89 *N.J.* at 496.

In deciding whether the nature and extent of an employee's handicap reasonably precludes job performance, an employer may consider whether the handicapped person can do his or her work without posing a serious threat of injury to the health and safety of himself or herself or other employees. *Panettieri, supra,* 159 *N.J.Super.* at 491–92. That decision requires the employer to conclude with a reasonable degree of certainty that the handicap will probably cause such an injury. The mere fact that the applicant is an epileptic will not suffice. Otherwise, unfounded fears or prejudice about epilepsy could bar epileptics from the work force.

The appropriate test is not whether the employee suffers from epilepsy or whether he or she may experience a seizure on the job, but whether the continued employment of the employee in his or her present position poses a reasonable probability of

substantial harm. That conclusion is consistent with a regulation of the Division on Civil Rights adopted since the occurrence of the facts that gave rise to this case. The regulation provides:

(a) It shall be lawful to take any action otherwise prohibited under this section where it can reasonably be determined that an applicant or employee, as a result of a handicap, cannot presently perform the job even with reasonable accommodation.

* * * * * * * *

(2) Refusal to select a handicapped individual may be lawful where it can be demonstrated that the employment of the handicapped person in a particular position would presently be hazardous to the safety or health of such individual, other employees, clients or customers. Such a decision must be based upon an objective standard supported by factual or scientifically validated evidence, rather than on the basis of general assumptions that a particular handicap would create a hazard to the safety or health of such individual, other employees, clients or customers. A "hazard" to the handicapped person is a materially enhanced risk of serious harm. *N.J.A.C.* 13:13–2.8 (effective June 17, 1985).

■ Although this regulation was promulgated subsequent to the events in the instant case, we find it strikes the appropriate balance of the various interests. Other jurisdictions have reached a similar result. *See, e.g., Kelley v. Bechtel Power Corp.,* 633 *F.Supp.* 927, 934 (S.D.Fla.1986) (in order to discriminate against a person with epilepsy "on the basis of possible future injury * * *[,]" there must be a showing of a reasonable probability of substantial harm. Such a determination cannot be based merely on an employer's subjective evaluation or * * * merely on medical reports. The question is whether, in light of the individual's work history, employment of that individual would pose a reasonable probability of substantial harm") (quoting *Mantolete v. Bolger,* 767 *F.*2d 1416, 1422 (9th Cir.1985)); *Foods, Inc. v. Iowa Civil Rights Comm'n,* 318 *N.W.*2d 162, 169 (Iowa 1982) (epileptic condition must "present a risk of danger"); *Higgins v. Maine Cent. R.R. Co.,* 471 *A.*2d 288, 290 (Me.1984) ("an employer seeking to assert the safety defense must establish 'that it had a factual basis to believe that, to a reasonable probability, the employee's physical handicap renders him unable to perform his duties or to perform

such duties in a manner which will not endanger his own health or safety or the health or safety of others' ") (quoting *Maine Human Rights Comm'n v. Canadian Pac. Ltd.*, 458 *A.*2d 1225, 1234 (Me.1983)); *Lewis v. Remmele Eng'g, Inc.*, 314 *N.W.*2d 1, 4 (Minn.1981) ("the employer must establish that it relied upon competent medical advice that there exists a *reasonably probable* risk of serious harm") (emphasis in original); *Chicago & N.W. R.R. v. Labor & Indus. Review Comm'n*, 98 *Wis.*2d 592, 297 *N.W.*2d 819, 826 (1980) (to establish the "future hazards exception," "the employer must establish to a reasonable probability that because of the complainant's physical condition, employment in the position sought would be hazardous to the health or safety of the complainant or to other employees or frequencies of the place of employment") (quoting *Bucyrus–Erie Co. v. ILHR Dept.*, 90 *Wis.*2d 408, 280 *N.W.*2d 142 (1979)). Thus, to invoke the safety defense as a justification for otherwise unlawful discrimination, the employer must reasonably conclude that the employee's handicap poses a materially enhanced risk of serious injury.

██ The Appellate Division correctly stated that the issue is "whether the decision by Food Circus to terminate Jansen was 'reasonably arrived at' as required by *N.J.S.A.* 10:5–2.1, and whether the nature and extent of Jansen's handicap 'reasonably precludes' the performance of the duties of a meat cutter [as required by *N.J.S.A.* 10:5–4.1]." 214 *N.J.Super.* at 58. Also, the court correctly found that under the safety defense, an employer's decision not to employ a handicapped person must be justified by a "probability" rather than a "possibility" of injury to the handicapped person or others. *Id.* at 60. The Appellate Division then held that Food Circus reasonably arrived at its decision to terminate Jansen because it based its decision on the opinion of Dr. Whalen that Jansen would probably suffer another seizure. Our review of the record leaves us uncertain whether the trial court so construed Dr. Whalen's testimony. It is unclear whether that court found that another seizure was possible or probable. The trial court,

however, did not find that another seizure, if it occurred, would result in the probability of harm to Jansen or to others. Similarly, the Appellate Division failed to find whether or not Food Circus reasonably concluded that the probability of another seizure prevented Jansen from performing his duties as a meat cutter without posing a materially enhanced risk of substantial harm to himself or others. Like the trial court, the Appellate Division equated a future seizure with the probability of such harm. That assumption is reflected in the Appellate Division's statement: "We are satisfied that the decision by Food Circus in reliance upon the determination by Dr. Whalen and that it was reasonably probable that Jansen would suffer another psychomotor seizure, was reasonably arrived at, and this circumstance reasonably precludes Jansen from the position as a meat cutter." 214 *N.J.Super.* at 61.

As the preceding statement reflects, the Appellate Division accepted the implicit assumption of Dr. Whalen, Food Circus's medical expert, that the likelihood that Jansen would suffer a seizure equated with the likelihood that he would endanger himself or others. The failure to distinguish between the risk of a future seizure and that of future injury is crucial. The assumption that every epileptic who suffers a seizure is a danger to himself or to others reflects the prejudice that the Law seeks to prevent. *See Andersen, supra,* 89 *N.J.* at 497 ("Undifferentiated fear and generalities will not suffice."); *Panettieri, supra,* 159 *N.J.Super.* at 493 ("each heart attack victim must be individually evaluated to determine whether he has the stamina, the dexterity, and the strength to do the job without a material risk of recurrence"). Indeed, Jansen's medical experts stated that even if he were to suffer another seizure at work, it probably would not result in harm to him or others. In the absence of expert testimony linking the likelihood of a seizure to the likelihood of harm, the lower courts should not have assumed that Jansen was unable to work as a meat cutter without materially enhancing the risk of harm to himself or others. Jansen's work involved the use of sharp instruments,

and our ruling should not be construed as prohibiting Food Circus from making the required showing. We state only that Food Circus must prove, not assume, that Jansen was dangerous.

We do not suggest that the employer, by firing Jansen without proof that he would endanger himself or others, is evil or even inconsiderate. The essence of discrimination, however, is the formulation of opinions about others not on their individual merits, but on their membership in a class with assumed characteristics. Unconscious discrimination prejudices its victims as effectively as discrimination that is malicious. For this reason, *N.J.S.A.* 10:5–4.1 requires an employer to consider whether "the nature and extent" of a handicap reasonably precludes the performance of the particular employment. The same reasoning underlies the provision in *N.J.A.C.* 13:13–2.-8(a)(2) that a decision to terminate the employment of a handicapped person because of his or her handicap "must be based upon an objective standard supported by factual or scientifically validated evidence, rather than on the basis of general assumptions that a particular handicap would create a hazard to the safety or health of such individual, other employees, clients or customers."

▮ Consequently, the opinion, reasonably reached, that an employee might suffer a seizure at work does not necessarily support the conclusion that such a seizure would present a risk of injury. *Foods, Inc.,* supra, 318 *N.W.*2d at 169; *Higgins,* supra, 471 *A.*2d at 291; see also *Silverstein v. Sisters of Charity,* 43 *Colo.App.* 446, 614 *P.*2d 891 (1980) (refusal to employ therapist because of history of epilepsy constitutes unlawful discrimination in light of fact that plaintiff had been employed in this capacity for eight years without causing injury, and her chances of having another seizure were considered one in one thousand); *Rose v. Hanna Mining Co.,* 94 *Wash.*2d 307, 616 *P.*2d 1229 (1980) (summary judgment of no discrimination reversed in action by job applicant alleging dis-

crimination because of epilepsy even though position involved working above molten metal; showing that applicant had done similar work for the past seven years presented fact question); *Chicago & N.W. R.R., supra,* 297 *N.W.*2d 819 (discharge of epileptic employee whose duties included welding on railroad tracks and operating a motor vehicle was unlawful in light of fact that he had not suffered a seizure in six months, and medication controlled his epilepsy). Accordingly, we conclude that an employer may claim that an applicant's epilepsy reasonably precludes performance of the job only after making an individualized assessment of the safety risk posed by the applicant's epilepsy. *Silverstein, supra,* 614 *P.*2d at 894; *Higgins, supra,* 471 *A.*2d at 291.

The failure of Food Circus's medical experts to distinguish between the risk of a seizure and that of harm to others rendered their reports deficient. Furthermore, Dr. Whalen's report reflects a failure to make an individualized assessment of the probability that Jansen's handicap would pose a risk of harm to Jansen or others. Those deficiencies, apparent on the face of the report, prevented Food Circus from reasonably arriving at the conclusion that Jansen was unable to work safely as a meat cutter.

An employer may not rely on a deficient report to support its decision to fire a handicapped worker. *Andersen, supra,* 89 *N.J.* at 502; *Panettieri, supra,* 159 *N.J.Super.* at 488. If, however, the employer relies on an adequate report, courts should not second-guess its decision. *Andersen, supra,* 89 *N.J.* at 496, 502. In arriving at its decision, the employer should review not only the report of its medical experts, but also relevant records such as the employee's work and medical histories. The employer thereby can independently reach an objectively reasonable decision about such matters as the probability that the employee will cause harm to himself or other employees. *See Mantolete v. Bolger,* 767 *F.*2d 1416, 1422–23 (9th Cir.1985); *Kelley, supra,* 633 *F.Supp.* at 933–34; *see also*

*Lewis, supra,* 314 *N.W.*2d at 4 ("employer must establish that it relied upon competent medical advice that there exists a reasonably probable risk of serious harm"). In an appropriate case, an employer might reasonably be expected to communicate with its expert about the meaning of the report. Here, where Jansen's treating neurologist, Dr. Silbert, expected increased medication to help provide better seizure control, Food Circus should have ascertained from its experts whether another seizure was probable or just possible. The employer should also have ascertained the probability that the employee would cause serious harm to himself or his co-employees if he suffered another seizure. The record, however, does not reflect whether the employer made that inquiry. Accordingly, we are unable to agree with the Appellate Division, which concluded that Food Circus "reasonably arrived at" the decision that Jansen could not safely work as a meat cutter. 214 *N.J.Super.* at 61.

## –III–

In two recent opinions, we have explicated the burdens both of production and of persuasion or proof in discrimination cases. When the employee alleges discrimination in hiring because of race, creed, color, national origin, ancestry, age, marital status, or sex, he or she makes out a *prima facie* case in this manner:

> The plaintiff must demonstrate by a preponderance of the evidence that he or she (1) belongs to a protected class, (2) applied and was qualified for a position for which the employer was seeking applicants, (3) was rejected despite adequate qualifications, and (4) after rejection the position remained open and the employer continued to seek applications for persons of plaintiff's qualifications. [*Andersen, supra,* 89 *N.J.* at 492 (citing *McDonnell Douglas Corp. v. Green,* 411 *U.S.* 792, 802, 93 *S.Ct.* 1817, 1824, 36 *L.Ed.*2d 668, 677 (1973)).]

With respect to the employer's burden in such a case, we recently explained:

> Once the employee has established a *prima facie* case, a presumption arises that the employer unlawfully discriminated against the plaintiff. [*Andersen v. Exxon Co.,* 89 *N.J.*] at 492–93. The burden of production then shifts to the employer to rebut the *prima facie* case by "articulat[ing] some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas v.*

*Green, supra,* 411 *U.S.* at 802, 93 *S.Ct.* at 1824, 36 *L.Ed.*2d at 678; *Andersen v. Exxon Co., supra,* 89 *N.J.* at 493. The employee is then accorded an opportunity to "prove by a preponderance of the evidence that the legitimate nondiscriminatory reason articulated by the [employer] was not the true reason for the employment decision but was merely a pretext for discrimination." *Andersen v. Exxon Co., supra,* 89 *N.J.* at 493. The ultimate burden of persuasion that the employer intentionally discriminated against the employee remains with the employee at all times. *Ibid.* [*Clowes v. Terminix Int'l, Inc.,* 109 *N.J.* 575, 596 (1988).]

In a handicap discrimination case, the employee, as part of his or her *prima facie* case, has the initial burden of proving that he or she can do the job. *Andersen, supra,* 89 *N.J.* at 499. The employer in such a case often "admits the disparate treatment, but claims that it was justified." *Id.* at 498. In effect, the employer asserts an affirmative defense, for which the burden of proof, like that for affirmative defenses generally, is borne by the party asserting it. *Panettieri, supra,* 159 *N.J.Super.* at 484. When the employer admits that he has discriminated against the employee because of the employee's handicap, fairness suggests that the employer bear the burden of persuasion that "the nature and extent of the handicap reasonably precludes the performance of the particular employment," *N.J.S.A.* 10:5–4.1, thereby justifying the discrimination. Further, the employer, who is in control of the facts needed to determine the qualifications for a particular job, is in a better position to prove that it reasonably arrived at the conclusion that the handicap precluded employment. *Andersen, supra,* 89 *N.J.* at 500; *see N.J.A.C.* 13:13–2.8 ("[t]he burden of proof is upon the employer * * * to demonstrate in each case that the exception [to liability under *N.J.S.A.* 10:5–4.-1] * * * is based upon an objective standard supported by factual evidence * * * "). Other jurisdictions have similarly held in handicap discrimination cases that once the employee establishes a *prima facie* case, the burden of persuasion shifts to the employer to show that it reasonably concluded that the handicap precludes the employee from performing his or her

job. *See, e.g., Kelley, supra,* 633 *F.Supp.* at 936; *Lewis, supra,* 314 *N.W.*2d at 4; *Samens v. Labor & Indus. Review Comm'n,* 117 *Wis.*2d 646, 345 *N.W.*2d 432, 439 (1984). In some cases, however, the handicap is so directly related to the job qualifications that the applicant's proof of his or her physical ability to do the job is tantamount to proof that the handicap would not hinder his or her performance. In such cases, "it serves no useful purpose to shift the burden of proof to the employer to prove that the applicant's handicap precluded effective job performance." *Andersen, supra,* 89 *N.J.* at 499 n. 5.

██ The elements of a *prima facie* case are different when the plaintiff asserts a discriminatory discharge. A handicapped applicant establishes discrimination in such a case by proving "(1) that he was [handicapped within the meaning of the law], (2) that he was performing his job at a level that met his employer's legitimate expectations, (3) that he nevertheless was fired, and (4) that the [employer] sought someone to perform the same work after he left." *Clowes, supra,* 109 *N.J.* at 597 (quoting *Loeb v. Textron, Inc.,* 600 *F.*2d 1003, 1014 (1st Cir. 1979)). In this context, the employee's proof that he or she was performing the job at a level that met the employer's legitimate expectations also proves that the handicap did not unreasonably hinder his or her job performance.

██ Once a handicapped employee in a discriminatory discharge case establishes a *prima facie* case, the employer's burden varies depending on whether the employer seeks to establish the reasonableness of the otherwise discriminatory act or advances a non-discriminatory reason for the employee's discharge. When the employer seeks to rebut the *prima facie* case by "articulating some legitimate, nondiscriminatory reason" for the employee's discharge, the burden of production— not the burden of proof or persuasion—shifts to the employer. The employee, then, may undertake to "prove by a preponder-

ance of the evidence that the legitimate nondiscriminatory reason articulated by the [employer] was not the true reason for the employment decision but was merely a pretext for discrimination." *Andersen, supra,* 89 *N.J.* at 493. In such a case, the ultimate burden of persuasion that the employer intentionally discriminated remains with the employee at all times. *Ibid.* If, however, the employer defends by asserting that it reasonably concluded that the handicap prevented the employee from working, the burden of proof—as distinguished from the burden of production—shifts to the employer to prove that it reasonably concluded that the employee's handicap precluded performance of the job. When asserting the safety defense, the employer must establish with a reasonable degree of certainty that it reasonably arrived at the opinion that the employee's handicap presented a materially enhanced risk of substantial harm in the workplace.

In the present case, the lower courts failed to require the employer to prove with a reasonable degree of certainty that Jansen's epilepsy would probably cause injury to himself or others. The record does not reveal whether the employer consulted with its medical experts and considered that probability before firing Jansen. In addition, the lower courts erred also in not imposing on Food Circus the burden of proof that Jansen's handicap reasonably precludes the performance of his duties as a meat cutter. Those errors require that we reverse the judgment of the Appellate Division and remand the matter to the Chancery Division for further proceedings consistent with this opinion.

So ordered.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, GARIBALDI, and STEIN—6.