236 N.J. Super. 191 (1989)
565 A.2d 404
DIVISION OF MOTOR VEHICLES, PETITIONER-RESPONDENT,
v.
RICHARD R. GRANZIEL, JR., RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 26, 1989.
Decided October 11, 1989.
*193 Before Judges PRESSLER, LONG and LANDAU.
Ruth Lowenkron argued the cause for appellant (Community Health Law Project, attorney).
John P. Bender, Deputy Attorney General, argued the cause for respondent (Peter N. Perretti, Jr., Attorney General of New Jersey, attorney; Michael R. Clancy, Assistant Attorney General, of counsel; Gary K. Sambol, Deputy Attorney General, on the brief).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
*194 Appellant Richard Granziel appeals from an order of the Division of Motor Vehicles (DMV) suspending his driver's license because of his epileptic disorder but permitting his application for relicensing after a year period during which he is seizure-free. Although we affirm on the basis of the factual and procedural complex here, we are nevertheless constrained to comment on what we perceive to be flaws in the regulatory scheme.
The significant facts, as well as the issues they pose, are best explained in the context of the relevant statutes and regulations. N.J.S.A. 39:3-10 authorizes the DMV Director to refuse, in his discretion, to grant a driver's license
to a person who is, in his estimation, not a proper person to be granted such a license, but no defect of the applicant shall debar him from receiving a license unless it can be shown by tests approved by the Director of the Division of Motor Vehicles that the defect incapacitates him from safely operating a motor vehicle.
Epileptic disorders are specifically addressed by N.J.S.A. 39:3-10.4 to 39:3-10.8, inclusive. The scheme requires prompt reporting to the Director by physicians of the fact of their treatment of persons of licensing age "for recurrent convulsive seizures or for recurrent periods of unconsciousness or for impairment or loss of motor coordination due to conditions such as, but not limited to, epilepsy in any of its forms, when such conditions persist or recur despite medical treatments...." N.J.S.A. 39:3-10.4. Such persons themselves are also required to report the existence of that medical condition both on their initial applications for licensure and on renewal applications. N.J.S.A. 39:3-10.5. At the heart of the statutory scheme is N.J.S.A. 39:3-10.6, which directs DMV, in consultation with the State Commissioner, to "establish a procedure for evaluation and screening of cases so reported." The stated purpose for such a procedure is to assure "that no person is unwarrantedly denied the privilege of operating a motor vehicle because of reports submitted under the provisions of the act."
*195 In response to the statutory mandate, DMV promulgated N.J.A.C. 13:19-5.1 to -5.10. N.J.A.C. 13:19-5.1 requires a person suffering from an epileptic disorder to establish, as a condition of issuance, renewal or retention of license, that "he has been free from recurrent convulsive seizures ... for a period of one year with or without medication and that he is physically qualified to operate a motor vehicle." It is clear, however, that the one-year requirement is not absolute. Thus, N.J.A.C. 13:19-5.4 requires the DMV Director to appoint, in consultation with the New Jersey Medical Society, a three-member Neurological Disorder Committee "to advise him as to issuing licenses to persons suffering from recurrent convulsive seizures...." And N.J.A.C. 13:19-5.7 authorizes the Director to license a person who has not been seizure-free "if the members of the Committee so recommend...." It is, of course, also clear that a person aggrieved by the Director's action is entitled to a contested-case hearing conducted by the Office of Administrative Law (OAL). N.J.A.C. 13:19-1.1 to -1.13.
Appellant, now 34 years old, was diagnosed as suffering from grand mal epilepsy when he was 16. His illness is attributed to a traumatic head injury he suffered when he was 12 and a reinjury four years later. He has, in fact, been a licensed driver of this state since the age of 19. He has never been involved in an accident attributable to his disorder, although he has, through the years, experienced periodic grand mal seizures, that is, a complete loss of consciousness lasting several minutes. The seizures occur, typically, several times a year despite the fact that he takes Dilantin, an anti-seizure medication, daily. The precipitating event resulting in the suspension of his license was a seizure he suffered in September 1987 while in his office when employed by the City of Plainfield as a sanitarian-trainee. The incident was apparently reported to DMV, and appellant's physician, Dr. Robert E. Green, the neurologist who has treated him since the inception of his illness, submitted the required reports. The Director sent these *196 reports, together with appellant's own explanatory statement, to the three physicians constituting the Neurological Disorder Committee, and each recommended against a waiver of the presumptive one-year suspension period. The Director thereupon entered an order of suspension, effective December 25, 1987, "because reasonable grounds exist to cause this Division to believe that you are not physically qualified to operate a motor vehicle with safety based upon information of record which indicates that you are subject to convulsive seizures and the unfavorable recommendation of the Division's Medical Advisory Panel." The order advised appellant of his right to a "formal hearing," which he then requested and received.
Appellant and his physician, Dr. Green, were the sole witnesses. The medical evidence was consistent with the observation of the Supreme Court in Jansen v. Food Circus Supermarkets, Inc., 110 N.J. 363, 368 (1988), that "[e]pileptics are not all alike. * * * The nature, timing, and frequency of seizures vary from one epileptic to another. * * * Accordingly, epileptics must be viewed not as fungible members of a class, but as individuals." We also understand that while the symptomatological pattern of the disorder varies widely from person to person, nevertheless an individual's own symptomatological pattern ordinarily does not. The relatively consistent characteristics of appellant's disorder include a pre-seizure aura. An aura consists of a series of physical sensations, not themselves debilitating or incapacitating, which presage a loss of consciousness. Some grand mal epileptics have an aura which forewarns of an impending loss of consciousness, and others do not. The lapse of time, moreover, between the aura and the seizure also varies among those persons who do experience auras. We do, however, understand that as a matter of medical probability and predictability, when an aura is present, it is an integral component of the person's individual symptomatological pattern. Both its occurrence and the interval between its onset and loss of consciousness are relative constants in an individual disorder. In appellant's case, he says that a loss of consciousness has *197 always been preceded by an aura and that this pattern will predictably continue. He also asserts that in his case, the time lapse between the onset of the aura and loss of consciousness is about a minute and a half.[1] The other relative constant of appellant's disorder pattern, according to his uncontroverted statement, is that seizures are typically triggered by fever, a cold or a viral infection, a change in medication, extreme stress, or extremely high ambient temperature and humidity.[2] Appellant testified that he consequently has never driven, as a matter of self-imposed restriction, when either suffering or recovering from a viral episode.
With respect to his prior driving history, appellant testified that although he has never had an accident related to his disorder, he has had one automobile-related seizure. As he related that event, which occurred in January 1987, he had recently recovered from the flu and believed himself to be no longer at risk of seizure. However, he felt the onset of an aura while driving on Route 22. Since he ordinarily drives in the right lane of a multi-lane roadway and was then in that lane, he was able immediately to move into what he described as an "access" lane, but which was available for regular bus traffic. There he stopped, turning off the engine. The incipient aura *198 passed, however, and when he felt that the risk was over, he continued to his destination, a nearby highway store. Just as he had parked in the store parking lot, the aura began again. This time it progressed to a seizure with loss of consciousness, and appellant, knowing at some point that a seizure was imminent, "just laid down on the front seat, and waited for the seizure to come."
Based on the foregoing, essentially the same information he had presented to the Neurological Disorder Committee, appellant argued that he could be safely licensed since he voluntarily did not drive during the risk period of viral infection and since his invariable experiencing of an aura enabled him to get off the road safely before loss of consciousness. This position was fully supported by Dr. Green.
In evaluating these essentially undisputed facts, the administrative law judge nevertheless concluded that the extremely short duration between onset of the aura and loss of consciousness created a serious risk if the aura were to begin while defendant was driving. Referring to the January 1987 incident, she noted that "[c]ommon sense indicates, however, that respondent could find himself in such a situation again on a road where he cannot pull out of traffic prior to the onset of a seizure." She also pointed out the significance of that incident in demonstrating that although appellant "may have good intentions, he himself may not be able to accurately predict when he is susceptible to the onset of a seizure." Thus, although she expressly confirmed that she had given more weight to Dr. Green's reports and opinions than to the contrary recommendations of the members of the Neurological Disorder Committee, and although she clearly stated that she did not construe N.J.A.C. 13:19-5.1 as imposing a non-rebuttable one-year presumption, she nevertheless concluded, based on the facts before her and as she found them, that appellant then posed a driving risk and should be subject to the one-year seizure-free rule.
*199 The Director concurred. Expressing his sympathetic appreciation of the resultant hardship and inconvenience to appellant, he was nevertheless persuaded that permitting appellant to continue to drive under the circumstances would unreasonably compromise the safety interests of the motoring public. His suspension order was then entered in May 1988, effective December 1987, as originally directed.
Appellant moved for reconsideration based on Jansen v. Food Circus Supermarkets, Inc., supra, which had been decided in the interim. Jansen, an employment discrimination case, held that an employer who disparately treats an epileptic bears the burden of persuasion on the question of whether the nature and extent of the resulting handicap preclude performance of the employment at issue. The Director considered Jansen and issued a supplemental opinion in which he rejected the argument that its holding respecting allocation of the burden of persuasion should be applied to driver license suspension proceedings. He reasoned that licensure is a privilege, not, as in the case of employment, a civil right; that the State has an overriding interest in the safety of its roadways; and that the regulatory one-year presumption reasonably accommodates both the public and private interests involved. In this regard, he emphasized that the purpose of N.J.S.A. 39:3-10.4, et seq., was to "direct the Division to balance the driving privileges of epileptics against the public interest in highway safety." He concluded that
[i]n striking this balance, the driving privileges of persons who suffer recurrent seizures despite medical treatment must yield to public safety. Licensure of said persons to operate motor vehicles which are potentially dangerous instrumentalities can reasonably be expected to result in personal injuries and death from accidents. I am not unmindful of the fact that there have been fatal accidents in this State which have been directly attributable to drivers suffering seizures while driving motor vehicles. Conversely, driving privileges may be granted to "controlled" epileptics because it has been medically demonstrated that the seizures have been under control for such a substantial period that it may be predicted with reasonable certainty that the seizures will not recur if medical treatment is continued. In such cases, the balance is struck in favor of licensure because highway safety is not jeopardized.
*200 Accordingly, he reaffirmed his original order, and this appeal ensued.[3]
As we understand the challenges made to the suspension order, appellant contends first that he adequately demonstrated that it is safe for him to drive despite the recurrence of his seizures and, hence, that the Director's contrary conclusion was arbitrary and unreasonable. He further argues that the regulations inherently and as applied misconstrue the mandate of the enabling act since they do not require the licensing decision to be based on the finding of reasonable probability that substantial harm would result from his driving. Finally, he argues that the regulations establish an unconstitutional "irrebuttable/conclusive presumption" that a person with recurring seizures within a one-year period is an unsafe driver.
Despite the verbiage of the regulations and any procedural flaws there may have been, we are persuaded that appellant's case was considered, evaluated, and decided on a wholly individualized basis. Particularly in view of the OAL hearing, we are convinced that the right ultimate question was asked and answered by DMV, namely, whether by reason of his own specific symptomatological pattern of grand mal epilepsy and in light of the fact that his illness is not medically controlled to the point where he is seizure-free for a year, is it probable that appellant can drive an automobile without material risk either to himself or the public?
We are satisfied from our review of the record that the ALJ's fact-finding and the Director's concurring determinations were *201 supported by the evidence, were consistent with the legislative intent, and were duly cognizant of and sensitive to appellant's competing rights and interests. It was not unreasonable to conclude, particularly in view of the nature and volume of traffic on New Jersey's congested roadways, bridges and tunnels, that a minute and a half warning of seizure is not long enough to defuse the risk of a driver's loss of consciousness behind the wheel. Appellant's own recent miscalculation of his ability to predict the timing of his risk of seizure could reasonably have constituted a significant decisional factor. Thus, it was not the fact that appellant suffers from grand mal epilepsy upon which the Director based his action. Nor was it the fact that appellant's epilepsy is not under medical control sufficient to have suppressed seizures for a year. The decision was rather based on the conclusion that the pattern of appellant's specific individual disorder poses the risk. Were the time lapse between onset of the aura and loss of consciousness longer  long enough at least to provide a more realistic margin of safety for a driver who has to get off the road  this might be a different case, the agency determination might have been different, and our review of an adverse agency determination might have been different. It might also be a different case if the seizure trigger or the time of occurrence were more certain and predictable. Unfortunately, they are not. Thus, irrespective of such issues as allocation of the burden of coming forward and the burden of persuasion, the validity of the presumption, and the probative effect of a rebutted presumption, there was nothing arbitrary, unreasonable or inconsistent with the fair weight of the evidence in the Director's decision that the characteristics of appellant's specific and individualized epileptic disorder at this time "incapacitates him from safely operating a motor vehicle," the ultimate licensing standard of N.J.S.A. 39:3-10.
Despite the foregoing, we deem it appropriate to respond to appellant's remaining arguments. We reject his contention that N.J.A.C. 13:19-5.1 creates an unconstitutional irrebuttable *202 presumption. It does not. As we read the regulations in the light of the enabling legislation and the contested-case hearing opportunity, the overall effect of N.J.A.C. 13:19-5.1 and 13:19-5.7, the "waiver" terminology of the latter notwithstanding, is to create the rebuttable presumption that unless a person suffering from a seizure disorder has been seizure-free for a year, his disorder is not sufficiently controlled to permit him to drive safely.[4] We are first satisfied that such a presumption is fair. Obviously, a person who is likely to suffer loss of consciousness, loss of motor control or loss of motor coordination while driving ought not to be driving. Nor is it unreasonable to conclude that if a person is not seizure-free for a year, the lack of control over the disorder so evidenced renders him a probable driving risk. As far as it goes then, the presumption meets the test of a likelihood that as a matter of common relevant experience, the presumed fact follows from the proved fact and, hence, that there is the requisite rational nexus between them.[5]See, e.g., In re Blake's Will, 21 N.J. 50, *203 59 (1956); Davidson v. Fornicola, 38 N.J. Super. 365, 378 (App.Div. 1955), certif. den. 20 N.J. 467 (1956). The point, of course, is that some persons are able to drive safely even if their seizure disorder is not under a one-year seizure-free degree of control. This may be true of persons whose disorder includes an extended aura or whose seizures are predictably precipitated or occur only during sleep or because of other characteristics of their individualized symptomatology. A person who believes he can be a safe driver although not seizure-free for a year has a fair opportunity to overcome the presumption, first by demonstrating that fact to the Neurological Disorder Committee and then, if unsuccessful, by way of a contested-case hearing.
As to the Committee evaluation, we agree with appellant that N.J.A.C. 13:19-5.7 is inartfully drawn. Its first defect is its failure expressly to articulate the standard governing the Committee's evaluation. While such a standard should be stated in the regulation, we are satisfied that it is nevertheless implicit in the statutory and regulatory scheme as a whole and is one which requires the members of the Committee to determine whether, despite the occurrence of a seizure within a year period, the person, because of the specific characteristics of his disorder, can drive safely. The regulation, moreover, does not require the recommendations of the Committee members to respond with particularity directly to the applicant's specific reasons for contending that despite the recurrence of seizures he is unlikely to suffer a seizure while driving. Such a direct response and analysis would not only provide more pertinent and useful assistance to the Director, but would also assure the applicant that it was the nature of his own disorder which formed the decisional basis. While it is clear from the recommendations here that the Committee members in fact considered all of the relevant material submitted to them, their statements were nevertheless perfunctory and conclusory and did not directly relate the characteristics of appellant's disorder to the question of driver safety.
*204 Finally, the verbiage of N.J.A.C. 13:19-5.7 appears to authorize the Director to issue a license to a person who is not seizure-free for the requisite period only if the members of the Committee so recommend. We believe that this overstates the Committee's role. If its negative recommendations were binding on the Director rather than merely advisory, as specified by N.J.S.A. 39:3-10.6, a serious question of improper delegation of administrative power would arise. Compare In re North Jersey Dist. Water Supply Comm'n, 175 N.J. Super. 167 (App.Div. 1980); N.J. Dept. of Transp. v. Brzoska, 139 N.J. Super. 510 (App.Div. 1976). The initial determination must be the Director's, based on all the information before him, including the Committee's recommendations. His exclusive responsibility in this regard also necessitates a more detailed, specific and individually responsive form of Committee recommendation. We commend, therefore, to the Director the issue of appropriate revision to clarify the present regulation in these respects.[6] Nevertheless, we are satisfied that whatever defects there may have been in the Committee stage of the process were effectively cured by the contested-case hearing conducted by the administrative law judge who, as we have noted, properly focused the inquiry and addressed the proper questions.
With respect to appellant's argument that Jansen applies to these proceedings, we understand him to be contending that Jansen requires the Director to bear the burden of persuasion that appellant poses an unacceptable risk, rather than imposing on appellant the burden of persuasion that he does not. We agree with the Director's reasons for rejecting this assertion. Jansen involved a traditional adversarial context in which burdens of persuasion are subject to traditional trial allocations. Not so here. This is an administrative proceeding in which an applicant seeks a privilege administratively accorded *205 by a state officer and agency whose primary responsibilities are protection and promotion of the public interest in highway safety. The applicant bears, as does every applicant seeking an administratively granted privilege, the burden of demonstrating his eligibility therefor. The rules of eligibility must, to be sure, be fair, relevant and rational and not arbitrarily or unreasonably applied. But it remains the applicant's burden to show his qualification. For this reason we need not deal with the question of whether the effect of the one-year presumption is to shift not only the burden of coming forward but also the burden of persuasion. See Silver Lining v. Shein, 37 N.J. Super. 206, 216-18 (App.Div. 1955). Both were appellant's from the outset.
As to the issue of the continuing probative force of the presumption once countervailing evidence is adduced, we note that this jurisdiction has opted for the rule which does not automatically vitiate the presumption on the ground that it is exclusively a procedural device. Rather, we permit the finder of fact, in his consideration of all of the evidence, to accord probative weight to any permissible inferences raised by the proved fact, including the presumed fact itself. See Evid.R. 14. And see Silver Lining v. Shein, supra. Our review of the record convinces us that this rule was in effect followed here and that the one-year presumption was not accorded any undue weight.
Because of the importance of the issue, we have canvassed the law of other states. Beyond the variation in the length of the presumptive period, see n. 5 supra, the general rule appears to be that the administrative decision to withhold driver's licensing will be affirmed if it was fairly based on an individualized consideration of the applicant's medical situation and its probable effect on driving safety. Compare Higgins v. Dept. of Public Safety of the State of Fla., 138 So.2d 530 (Fla. Dist. Ct. App. 1962) with Ormond v. Garrett, 8 N.C. App. 662, 175 S.E.2d 371 (Ct.App. 1970). And see cases collected in Annot., *206 "Driver's License  Suspension  Disease," 38 A.L.R.3d 452 (1971). This was done here.
The decision appealed from is affirmed.
NOTES
[1] Although loss of consciousness has always been preceded by an aura, not every aura is followed by a seizure, appellant having explained that up to a certain point in the occurrence of the various sensations constituting the aura, it may simply terminate. There was also some confusion respecting the time lapse. As we understand the evidence, however, appellant ordinarily experiences aura sensations for 30 to 45 seconds. These are followed by what he described as a tightness of his neck and chest muscles, a symptom he said was either the end of the aura or the beginning of the seizure. In any event, this stage lasts about a minute before loss of consciousness, resulting in a total time lapse of a minute and a half to a minute and three-quarters.
[2] Appellant experienced frequent seizures during a relatively brief period when he was just beginning attendance at medical school in Grenada, a phenomenon attributed by Dr. Green to the climate, and also during a period several years ago when he was undergoing treatment for Hodgkin's disease, of which he is now cured.
[3] DMV had urged us to dismiss the appeal as moot since the Director had restored appellant's driving privileges during the pendency of the appeal, appellant having been seizure-free for a year following the original suspension date. We decline to do so for two reasons. First, appellant suffered another seizure shortly before oral argument and his license was again suspended on July 26, 1989. Moreover, we are satisfied that the issues raised here are of sufficient importance to warrant their consideration even if they had been moot. See, e.g., Matter of Farrell, 108 N.J. 335, 347 (1987); Falcone v. De Furia, 103 N.J. 219, 226 (1986); Matter of Conroy, 98 N.J. 321, 342 (1985).
[4] The regulation, of course, also creates the obverse presumption that a person suffering a grand mal epileptic disorder is able to drive safely if his disorder is sufficiently controlled so that he suffers no seizure for a year. It is this presumption that appellant had the benefit of when his license was restored.
[5] There is nothing in the record to suggest as a matter of reasonable medical probability that the one-year period prescribed by the regulation is excessive, and appellant does not here challenge the regulation on that basis. In any event, we note that the amicus curiae brief submitted to the Director by the Epilepsy Foundation in support of appellant's motion for reconsideration tabulates the similar regulatory schemes of all other states. Of the fifty states plus Puerto Rico and the Virgin Islands, seventeen require a one-year seizure-free period without provision for any individual modification, eight require a six-month period, and four require a three-month period. One requires a two-year period if the person is not on medication and a one-year period if he is. Thirteen have no prescribed minimum period. In addition, seven, including New Jersey, prescribe a one-year period subject to circumstantial modification, one prescribes a six-month period, one a three-month period, and one a thirteen-month period. We see no reason why the one-year period could not be challenged based upon appropriate medical proofs. No such proofs were presented here and, as noted, no such direct challenge made.
[6] Nor do we foreclose appellant's right to reapply to the Director in accordance with any amended regulation.