**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0494-18T4

V.L.,

    Plaintiff-Appellant,

v.

HUNTERDON HEALTHCARE,
LLC, and HUNTERDON
MEDICAL CENTER,

    Defendants-Respondents.

_____

> Argued November 6, 2019 – Decided December 6, 2019
>
> Before Judges Yannotti, Hoffman and Firko.
>
> On appeal from the Superior Court of New Jersey, Law Division, Hunterdon County, Docket No. L-0486-15.
>
> Thomas A. McKinney argued the cause for appellant (Castronovo & McKinney, LLC, attorneys; Thomas A. McKinney, of counsel and on the briefs; Megan Frese Porio, on the briefs).
>
> Pamela J. Moore argued the cause for respondents (McCarter & English, LLP, attorneys; Pamela J. Moore, of counsel and on the brief; Sami Asaad, on the brief).

PER CURIAM

Plaintiff V.L.[1] appeals from the summary judgment dismissal of her complaint against her employer, defendants Hunterdon Healthcare, LLC and Hunterdon Medical Center, alleging disability discrimination, failure to accommodate, and retaliatory discharge, in violation of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49. We reverse.

I

We derive the following facts from the summary judgment record. Plaintiff began working for defendants around 1996, at the age of approximately twenty-six. She began as an employee at the help desk, and was later promoted to coordinator. Plaintiff was then promoted to a project analyst position, and then a web analyst position. While in that position, she applied in 2009 to become an Electronic Medical Record (EMR) Application Analyst, the position responsible for handling data for defendants' electronic medical record system. She received the position, and continued to serve in it from 2010 through 2015.[2]

_____

[1] We refer to plaintiff using her initials to protect her privacy.

[2] Defendants contend that plaintiff did not begin working for Hunterdon Healthcare, LLC (which does business as Hunterdon Healthcare Partners (HHP)) until 2010, when she began the EMR position – they allege that the LLC is a separate entity from Hunterdon Medical Center (HMC), where plaintiff

Plaintiff was first diagnosed with depression and anxiety while in high school. Plaintiff's first leave of absence as an EMR Analyst occurred in 2012, when she missed one month from work as a result of depression. Plaintiff also took a six-day leave of absence in 2013.

Plaintiff was first permitted to work from home during some of her weekly hours in 2000. At one point in 2013, Jeffrey Weinstein, the executive director and CEO of HHP, gave approval for plaintiff to work from home a total of sixteen hours per week, and to work in the office for the remaining twenty-four hours per week. Following a project in 2014, during which plaintiff was in the office full-time, she began working from home two hours per day, from 5:30 a.m. to 7:30 a.m., and then worked six hours in the office, Monday through Thursday, and she worked from home on Fridays. Weinstein also approved this schedule.

In January 2014, plaintiff's supervisor, Jean Fitzgerald, completed an Employee Annual Evaluation for plaintiff, which assessed fifteen different "[p]erformance [c]ompetencies." Fitzgerald rated plaintiff as "exceptional" in eight

---

began working in 1996. Plaintiff's application for the EMR position makes it appear that her receiving the position would constitute an internal hire.

A-0494-18T4

competencies and "highly effective" in the remainder.[3] Weinstein signed his name on the evaluation, confirming that he reviewed the evaluation and presumably concurred with the ratings. Plaintiff received a raise in January 2014.

On December 8, 2014, plaintiff notified defendants that she would "be out of work on disability," and she could not state how long because her "doctor did not specify." The following week, plaintiff completed and submitted an employer-supplied document entitled Leave of Absence Request and Agreement (the Leave Agreement), which listed her "leave start date" as December 9, and "return to work date" as February 1, 2015. The Leave Agreement noted that "[i]f [plaintiff's] request for leave is granted, [she has] a right to take up to twelve (12) weeks of leave in a [twelve]-month period . . . ." It also provided that if plaintiff did "not return within the time period allowed," defendants may post her position.

Plaintiff maintained contact with defendants during her leave. On January 30, 2015, she emailed defendants advising she had just seen the doctor, and her "new tentative return date is March 2nd," thereby taking the full twelve weeks of leave acknowledged in the Leave Agreement.

---

[3] The Employee Annual Evaluation defined "exceptional" as "[p]erformance [that] is consistently superior and significantly exceeds position requirements," and "highly effective" as "[p]erformance frequently exceeds position requirements."

On February 25, 2015, five days before the March 2 return date, plaintiff sent Weinstein the following email:

> I am trying to figure out how I can manage so I can come back to work. Is there any possibility of working just remotely? Even if it's just on a trial basis for a few months and see how it goes. I might be able to handle coming in [one] or [two] days for meetings or going over work to be done. I don't know that I can manage otherwise. I really don't wish to lose my job but may not have a choice.

Approximately forty-five minutes later, Weinstein responded, in pertinent part: "Unfortunately the job does require working on site. We have been able to accommodate your need to get your daughter on the bus as she is not yet in high school. We hope you are able to return to work soon . . . ." Plaintiff responded later that day with two emails – the first stated, in part:

> I have to say [I] am not feeling very valued. My reason for asking to work at home are for my own health reasons. I don't quite understand the at[-]work requirement when we have remote consultants doing exactly what [I] do. Nevertheless [I] would like to return to work as soon as [I] am able."

The second email stated, in part:

> [A]s [I] think more about it [I] am feeling more pushed out than valued. I realize that Tony Albanese works for [HME] and not [HHP] but when he decided to move to the shore he was accommodated with working at home. Nothing to do with health or any young kids.

A-0494-18T4

The next email that appears in the record between the parties came from defendants on February 27, 2015; it included an attached letter from Weinstein, stating in part:

> This letter is to remind you that your [twelve] week leave of absence will come to an end on Tuesday, March 3, 2015. At that time we hope you are able to return to your full duties. If you are not able to return on the date mentioned above, it is our understanding that you would be considering applying for long[-]term disability. . . .
>
> [I]f you are unable to return on . . . March 3 . . . we will have to post your position as EMR Applications Analyst. However, if you are able to return to work prior to us filling the position, you would be considered for rehire.

At his deposition, Weinstein conceded that this email, to his knowledge, was the first time defendants gave plaintiff a formal "date stating [she would] have to return . . . or [she] will be considered terminated."

On March 2, 2015, Fitzgerald emailed Weinstein, stating that if he meets "with [plaintiff] and sever[s] her employment, [to] please get her key and ID badge. We can pack her desk for her."

On March 6, 2015, plaintiff emailed defendants stating that she just visited her doctor and did not receive "clearance to return just yet. Maybe in a few weeks." The record includes a March 6 document filled out by her doctor, Jay Kuris, M.D.,

6

answering "Yes" to the question, "Is patient able to work at his/her regular occupation?" Dr. Kuris listed the "actual recovery date" at April 1, 2015. At her deposition, plaintiff confirmed that she knew these facts on March 6; the parties dispute whether plaintiff supplied defendants with this documentation from Dr. Kuris – plaintiff testified that she did, and defendants assert she did not.

On March 9, 2015, defendant posted plaintiff's EMR Analyst position. On that same day, Fitzgerald sent another email to Weinstein asking, "At what point is [plaintiff] officially severed? We need to get her key and ID badge.'"

The next communication between the parties that appears in the record is an email from defendants to plaintiff's work email (all communications prior to March 11, 2015 involved plaintiff's personal email address). Attached was a letter from Weinstein, stating that plaintiff failed to return to work after March 3rd, and:

> You have now notified us that you are still unable to return to work without restriction. You have also informed us that you may never be able to return to work and are seeking permission to work from home on an indefinite basis.
>
> Unfortunately, HHP cannot extend you[r] further leave or approve your request to work from home at this time for several reasons, not the least of which is the lack of any objective medical support for your claimed need to do so. More importantly, the essential functions of your position require you to be in attendance at work on a regular basis to collaborate with the clients you serve, i.e., the physician practices. Accordingly, eliminating

7

A-0494-18T4

your need to report to work is not a reasonable accommodation. That said, provided the request for occasional homework assignments is supported by objective medical evidence, HHP might be able to allow you to work from home on an occasional as-needed basis. . . .

As of now, you are expected to return to work by Monday, March 16, 2015. If you remain unable or unwilling to do so, then HHP will move forward to fill your position. If you are able to return to work on Monday . . . and still would like to request occasional home work as a form of accommodation, or if you require any other type of accommodation to enable you to work in the office, we will provide you with the paperwork necessary for you to have your treating physician complete and return to us for consideration.

The email and letter was later sent to plaintiff's personal email address on March 15, the day before Weinstein's deadline to return to work. Two-and-a-half hours later, plaintiff responded:

I am seeing this for the first time . . . . I cannot get clearance today to return tomorrow. The doctor is not even open. My next [appointment] is currently March 26th. Did you also send this on the 11th? That looks like when [the letter is] dated. I did not see it.

Plaintiff sent two more emails that day: the first stated, "I also don't recall saying I may never return to work." The second stated, "As I re-read the letter I'd also like to clarify my request was not to work home indefinitely, but temporarily on a trial basis for now. If it helps I would like [sic] the paperwork for the doctor."

A-0494-18T4

The next day, March 16, at 4:43 p.m., plaintiff received an email with another letter from Weinstein, and an "Essential Job Functions Form" for plaintiff's doctor to complete. Weinstein's letter repeats much of the same, except the following:

> [T]he nature of your serious medical condition as set forth in the Medical Certification provided by your treating physician strongly suggests that you would not be able to be productive at home even if a request for homework were reasonable. Specifically, the [certification] indicates that you "cannot sustain attention, effort, concentration or demeanor" due to "excessive depression, anxiety, stress and worry." Unless there has been a substantial change in your circumstances, the essential functions of your position cannot be done . . . .
>
> In any event, while we have reason to doubt whether there is any accommodation that could enable you to perform the essential functions of your position, we welcome any input from your treating physician in this regard. We certainly do not want to overlook any reasonable options that may make it possible for you to perform the essential functions of your position. . . . Please have your treating physician return the enclosed to me no later than March 23.

This letter mistakenly relied on outdated paperwork and forms that Dr. Kuris submitted for plaintiff's past New Jersey disability insurance benefits for the time when plaintiff could not work. Dr. Kuris signed the forms on December 22, 2014; on the same page as the language quoted by Weinstein, Dr. Kuris wrote "[February]

1, [20]14" next to "Estimated Recovery: (Give the approximate date patient will be able to return to work.)" – presumably, Dr. Kuris meant to write February 1, 2015.

Plaintiff's brief points out that the essential job functions form "restricts [p]laintiff's ability to work from home to a maximum of two hours per day and only upon a showing of 'objective medical evidence.'" At her deposition, Fitzgerald confirmed there was a time when plaintiff worked two days per week from home, and another time when plaintiff would work from home for two hours, Mondays through Thursdays, and all day on Fridays. She agreed that those scenarios were "different than what's being listed . . . as part of the essential job function . . . ."

Plaintiff moved her doctor's appointment up from March 26 to March 19. According to Dr. Kuris, when he saw plaintiff on March 19, "she appeared to be sufficiently improved to return to work on a part-time basis," specifically six hours in the office and two at home, as required in the essential functions form. Thus, he was prepared to give plaintiff clearance on March 19. However, the record indicates the doctor's clearance paperwork was signed on March 25. Yet, on March 23, plaintiff emailed defendants asking, "Did you get the paperwork from the doctor? I don't know if I should be making an appointment with [OCC][4] to try and return."

---

[4] It appears that OCC is a unit within defendants' Occupational Health Services (OHS), an in-house health department that, in part, evaluates employees who seek to return to work following a leave of absence.

Defendants responded they did not receive the paperwork, and they "cannot proceed without it." Plaintiff replied, "I will call the doctor[']s office. He said he would fill everything out and get it back by today[, s]o I don't know what happened." Plaintiff was unable to retrieve the paperwork and submit it until March 25, when she arrived at an appointment with defendants' health services department regarding her return.

Jacqueline Ritter, a physician's assistant within defendants' health services center, met with plaintiff on March 25 regarding her potential return to work. As plaintiff's brief notes, and defendants do not dispute, Ritter "is not a [p]sychologist, [p]sychiatrist, or [c]linical [s]ocial [w]orker, and has no degree, accreditation, or certificate for any type of mental health issues."

Ritter wrote in her records that before the meeting, she had a discussion with Human Resources, namely Lisa Schulte and Maura Cocino, an executive assistant who was part of the email chains with plaintiff, "as there w[ere] concerns for [plaintiff's] return today being forced upon [her]. [Cocino] was advised that her doctor may return [plaintiff] if forced to as to save her position, even when the employee may not be ready to return."

At her deposition, Ritter stated that Cocino also informed her "that they had a good candidate that they [were] considering for hire for [plaintiff's] position," and "in her eight years performing evaluations for [d]efendants, this was the first time

11

she had ever been informed that a replacement had been found for the individual she was evaluating." Ritter admitted telling Cocino "they should have proceeded with separation and hiring of their candidate."

Ritter wrote that during their March 25 meeting, plaintiff was "[v]ery emotional, crying throughout discussion today in the office," and "[f]lat affect [was] noted." Ritter wrote that she met again with Schulte and Cocino, and told them "it is my opinion that she not be cleared to return to work, as she verbally stated she is not ready . . . ." However, on a return to work form she completed, Ritter did not check the box stating "[u]nable to return to work at this time," and instead checked off "other," and providing, "Employee has provided medical documentation requesting work accommodations. This is to be discussed with her supervisor . . . ."

Following her meeting with plaintiff, Ritter noted:

> [Plaintiff] inquired whether she should discuss with her supervisor whether they can accommodate the restrictions, and I advised her that it is the proper protocol to have this discussion prior to seeing OHS for clearance, and at this time, I would refer her back to her supervisor for that discussion prior to any determination of work clearance. I stated . . . that since her job protection is up, she may not have a job to return to, and may have to reapply for that position or another position . . . .

At her deposition, plaintiff denied telling Ritter that she was not ready to return to work, and rather told her that she was ready to work six hours continuously in the office, the amount of time sought in the essential functions form.

On March 26, Ritter wrote that she "[r]eceived a phone call from . . . Weinstein in conference with . . . Cocino at 9 [a.m.] to discuss [plaintiff]'s return to work." Ritter then spoke with Schulte, who "voiced concern over [Weinstein's] request that I contact the treating physician and counter his decision to return [plaintiff]." Ritter later told Weinstein that to counter the doctor would be inappropriate, and she instead contacted Dr. Kuris to discuss plaintiff's restrictions. At her deposition, Ritter confirmed that Dr. Kuris told Ritter that "he found [plaintiff] to be fit to return to work[,] working six hours in the office" – she also said that Dr. Kuris estimated that the accommodation would be necessary for two months.

On March 26, Ritter wrote that Weinstein "was in agreement" with Ritter that "he should determine if he can accommodate the restrictions prior to any consideration for return to work." The record lacks proof of any discussions or conduct by Weinstein regarding this determination; instead, on the morning of March 27, plaintiff emailed Weinstein stating "I am not sure I understand the delay or question on how to limit office hours. I have been working at home part time successfully for years. Is there something else I can answer?"

A-0494-18T4

Later that day, plaintiff received a termination letter via email from Weinstein. The letter stated that on March 25, plaintiff "reported to [OHS] that you were not 'emotionally ready' to return to work and admitted that you were doing so only because you felt pressured into it." This reasoning was confirmed by Weinstein at his deposition:

> Q. Is it your testimony that the decision not to reinstate [plaintiff] was based on a conversation she had with . . . Ritter wherein she said she was not emotionally ready to return?
>
> A. Yes.
>
> Q. Is that the only reason?
>
> A. Yes.

Plaintiff denies telling Ritter she was not emotionally ready, and instead claims she told Ritter only that she "was being pressured to be in the office full-time." Her position was reflected in her email back to Weinstein on March 29, which stated that Ritter "said you had to make [the time restrictions] approval and we would talk again before she could clear me." Ritter estimated she completed 100 return-to-work evaluations during her eight years with defendants, and stated she could "only recall denying [plaintiff] out of the 100 people."

After listing a series of facts he found "objective, material, [and] undisputed," the judge first determined that plaintiff failed to establish a prima facie case of

A-0494-18T4

disability discrimination under the LAD. After acknowledging the four elements of a prima facie case by citing to Victor v. State, 401 N.J. Super. 596, 609-10 (App. Div. 2008), affirmed in part and modified in part, 203 N.J. 383 (2010), the judge stated that the element "that ends up being the primary focus of both the defendant's and the [c]ourt's analysis is [the second element, which asks] whether or not the plaintiff was qualified to perform the essential functions of her position[,] with or without accommodation." The judge accepted defendants' argument that "in March . . . 2015, [plaintiff] either couldn't or she wasn't willing to perform the essential functions of the job."

In his oral and written opinions, the judge primarily relied on Svarnas v. AT&T Communications, 326 N.J. Super. 59 (App. Div. 1999), in reaching this determination. In the written opinion, the judge provided a block quote from Svarnas, which includes the following:

> [N]othing in the LAD is construed to prevent the termination of any person who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment. N.J.S.A. 10:5-2.1.
>
> . . . .
>
> An exception to [the duty to reasonably accommodate a disabled employee] exists where an employer reasonably determines that an employee, because of [the] handicap, cannot presently perform the job even

with accommodation.  N.J.A.C. 13:13-2.8(a) . . . .  The burden of proof is on the employer to demonstrate that the exception relied upon is based on such an objective standard supported by factual evidence.  N.J.A.C. 13:13-2.8(a)(3).

[Id. at 72-78) (emphasis in original)]

The judge later addressed the opinions of Ritter and Dr. Kuris.  He found:

There is a dispute . . . about how . . . Ritter found . . . plaintiff during this meeting on . . . March [25].

And at the conclusion of that memo . . . [Ritter] stated her opinion that [plaintiff] not be cleared to return to work because . . . [s]he appeared with flat affect and was very emotionally [liable] on evaluation . . . .

. . . .

I think it's fair to say that . . . it was debatable, it was a matter of professional medical opinion . . . just how capable [plaintiff] was of performing the essential job functions back at that point in time.

. . . .

Dr. Kuris reached a . . . different conclusion [from Ritter's] at roughly the same time period . . . .

So there is an element of subjectivity and a professional judgment . . . that was documented at this point in time.

The judge later returned to this topic, finding:

Dr. Kuris' opinion that [plaintiff] was cleared, that -- that was just -- that was an opinion, and [a] somewhat objective opinion at that.

Ms. Ritter made her own conclusions, which were somewhat subjective.

Both hers and Dr. Kuris' opinions were . . . based on some level of . . . professional training.

And then of course you have the opinion advanced by [plaintiff,] who challenges what she told Ms. Ritter on the twenty-fifth.

But those were all sort of subjective . . . opinions that . . . [p]laintiff's ability to perform the essential job functions as of that point in time. But they don't . . . create a material fact issue when all the objective medical evidence leading up to that point in time establishes that she really wasn't medically able to do the job at that point in time, or she was unwilling to do it. Whichever way you go with it, the employer was justified in doing what . . . [it] did.

The judge then summarized the objective evidence he frequently referenced:

[Plaintiff's] history of going out on disability before December[] 2014[;] her recent history beginning in December 2013[;] and the various e-mails where she kept extending the return date and changing the return date[; and] Dr. Kuris['] medical opinions, most particularly his one on December [22, 2014], and then there was the one on March [6, 2015] . . . .

. . . .

[T]his history of medical information that the employer had available to it . . . raised really serious questions about [plaintiff's] ability to perform the essential job functions.

Notwithstanding his acknowledgment of the divergent opinions of Dr. Kunis and Ritter regarding plaintiff's ability to return to work, and the dispute between plaintiff and Ritter as to plaintiff's statements and her condition on March 25, the judge concluded that, based on "the objective, undisputed/incontrovertible evidence that was available to plaintiff's employer as of the date of termination, no reasonable jury could conclude that plaintiff was discharged because of her disability, or in retaliation for taking an extended medical leave of absence." The judge further concluded that "no reasonable jury could conclude that plaintiff's employer failed to attempt to reasonably accommodate plaintiff's disability." Lastly, the judge reached "the inescapable conclusion that plaintiff was unable or unwilling to perform the essential functions of her job as of the date of her termination, March 27, 2018."

This appeal followed.

## II

We apply the same standard as the trial court in reviewing the granting of a motion for summary judgment. Townsend v. Pierre, 221 N.J. 36, 59 (2015). If there is no factual dispute, and only a legal issue to resolve, the standard of review is de novo and the trial court rulings "are not entitled to any special deference." Manalapan Realty, L.P. v. Manalapan Twp. Comm., 140 N.J. 366,

378 (1995). Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). The court considers whether "the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

The LAD prohibits the discriminatory discharge of an employee based on a disability,[5] unless the employer "reasonably arrive[s] at" the conclusion that the employee's disability "reasonably precludes the performance of the particular employment." Jansen v. Food Circus Supermarkets, Inc., 110 N.J. 363, 367 (1988) (quoting N.J.S.A. 10:5-2.1 and 10:5-4.1). Otherwise, the employer has a duty to reasonably accommodate a disabled employee unless the employer proves that such an accommodation imposes an undue hardship. Victor, 401 N.J. Super. at 610

---

[5] Depression "qualifies as a 'handicap' [or disability] under the LAD." Domurat v. Ciba Specialty Chemicals Corp., 353 N.J. Super. 74, 89-90 (App. Div. 2002) (citing Clowes v. Terminix International, Inc., 109 N.J. 575, 593 (1988)).

A-0494-18T4

(citing Potente v. County of Hudson, 187 N.J. 103, 110 (2006)); see also N.J.A.C. 13:13-2.5(b).

When a disabled employee seeks a reasonable accommodation from her employer, the employer must initiate a good faith "interactive process" with the employee by attempting to explore an appropriate accommodation. See Tynan v. Vicinage 13 of Superior Court, 351 N.J. Super. 385, 400-01 (App. Div. 2002). As this court explained in Tynan:

> While there are no magic words to seek an accommodation, the employee . . . 'must make clear that . . . assistance [is desired] for his or her disability.' Jones v. United Parcel Service, 214 F.3d 402, 408 (3d Cir. 2000) (quoting Taylor[v. Phoenixville School District, 184 F.3d 296, 313 (1999)]. Once such a request is made, 'both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith.' Taylor, 184 F.3d at 312 (quoting Mengine v. Runyon, 114 F.3d 415, 419-20 (3d Cir. 1997)).
>
> To determine what appropriate accommodation is necessary, the employer must initiate an informal interactive process with the employee. 29 C.F.R. § 1630.2(O)(3). This process must identify the potential reasonable accommodations that could be adopted to overcome the employee's precise limitations resulting from the disability. Ibid. Once a handicapped employee has requested assistance, it is the employer who must make the reasonable effort to determine the appropriate accommodation. Taylor, 184 F.3d at 311.

> To show that an employer failed to participate in the interactive process, a disabled employee must demonstrate: (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith. Id. at 319-20.
>
> [Ibid. (emphasis added).]

In Tynan, we addressed a request for accommodation by a judiciary employee who suffered from a variety of disabling conditions, including a stress and anxiety disorder. 351 N.J. Super. at 399. The plaintiff had been employed for many years and had an unblemished record, despite several medical conditions, until a new person was assigned as her supervisor. Id. at 403. Following an extended period of disability leave, the plaintiff requested to return to work, but she did not want to have to report to her current supervisor. Id. at 394. In the alternative, she requested that if she had to communicate with her supervisor that she do so only in writing. Id. at 401. The defendants did not respond to these requests, and ultimately treated her failure to return to work as a resignation. Id. at 394-95.

In reversing the trial court's grant of summary judgment to the defendants, we found:

> Once the vicinage knew of the handicap and Tynan's desire for assistance, the burden was on the vicinage to

A-0494-18T4

implement the interactive process. See Taylor, 184 F.3d at 315. If an extension of leave was not possible, then the vicinage had an obligation at that point, considering the information it possessed regarding Tynan's situation, to initiate the interactive process to determine what could be an acceptable accommodation to both sides. . . .

. . . .

[The plaintiff] has raised a factual dispute regarding whether the vicinage acted in bad faith by failing to initiate the interactive process. "[A]n employer who acts in bad faith in the interactive process will be liable if the jury can reasonably conclude that the employee would have been able to perform the job with accommodations." Taylor,184 F.3d 317-18. Tynan's failure to accommodate claim should not have been dismissed on summary judgment and must be determined by a jury.

[Id. at 402-04.]

To establish a prima facie case of discrimination, a plaintiff must show:

(1) plaintiff was handicapped or disabled within the meaning of the statute;

(2) plaintiff was qualified to perform the essential functions of the position of employment, with or without accommodation;

(3) plaintiff suffered an adverse employment action because of the handicap or disability; and

(4) the employer sought another to perform the same work after plaintiff had been removed from the position.

22

[Victor, 401 N.J. Super. at 609.]

A disability discrimination case alleging a failure to accommodate an employee's disability does not require proof of the fourth element (although in this case, it is undisputed that plaintiff was replaced upon being terminated). Id. at 610. Once a plaintiff establishes a prima facie case of discriminatory discharge, the burden shifts to the employer. Jansen, 110 N.J. at 382. The employer must then establish that it reasonably determined that the employee's handicap prevented him or her from working, or otherwise articulate some legitimate, "non-discriminatory reason' for the employee's discharge." Id. at 382-83. "The employee may [then] respond by proving by a preponderance of the evidence that the reason proffered by the employer 'was not the true reason for the employment decision but was merely a pretext for discrimination.'" Grande v. St. Clare's Health System, 230 N.J. 1, 19 (2017) (quoting Jansen, 110 N.J. at 382-83).

The Supreme Court has held that "the reasonable-accommodation consideration belongs in the second-prong" of the prima facie case analysis, and it can be satisfied by a plaintiff "by putting forth evidence either that she was actually performing her job or was able, with or without reasonable accommodation, to perform her job to her employer's legitimate expectations." Id. at 21. Thus, when the motion judge first determined that plaintiff failed to satisfy the second element

23

of the prima facie case, and second found that defendants did not breach its duty to engage in the interactive process, the judge essentially made two of the same holdings.

"Procedurally, courts have recognized that the prima facie case is to be evaluated solely on the basis of the evidence presented by the plaintiff, irrespective of defendants' efforts to dispute that evidence." Zive v. Stanley Roberts, Inc., 182 N.J. 436, 448 (2005). Moreover, "[t]he evidentiary burden at the prima facie stage is 'rather modest: it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent - i.e., that discrimination could be a reason for the employer's action.'" Id. at 447 (emphasis in original) (quoting Marzano v. Computer Sci. Corp., 91 F.3d 497, 508 (3d Cir. 1996)).

III

Evaluating only the evidence presented by plaintiff, Zive, 182 N.J. at 448, and viewing such evidence in a light most favorable to plaintiff, Brill, 142 N.J. at 540, we conclude there are genuine issues of material fact for a jury to decide to determine if defendants discriminated against plaintiff in violation of the LAD. The material questions of fact for the jury to consider include:

- whether plaintiff was able to perform the essential functions of her position at the time of her termination;

24

- whether defendants made a good faith effort to assist plaintiff in seeking accommodations, or engaged in good faith in the interactive process, Tynan, 351 N.J. Super. at 400-01;

- whether plaintiff stated to Ritter that she was not ready to return to work;

- whether defendants were sufficiently informed that plaintiff was prepared to return to work on or before March 23, 2015;

As noted, plaintiff's leave of absence according to her written agreement with defendants expired on March 2, 2015. Thereafter, however, defendants maintained contact with plaintiff, extending her return-to-work dates multiple times, and offering her the opportunity to present reasonable accommodations other than working from home full-time. These communications culminated on March 25, when plaintiff arrived at defendants' office for an appointment with Ritter regarding her return to work, with paperwork from Dr. Kuris finding plaintiff "medically cleared to return to work" and recommending "a limit of [six] hours in the workplace," as required by defendants in the essential job functions form.

Ritter wrote that during their meeting, plaintiff "inquired whether she should discuss with her supervisor whether they can accommodate the restrictions," and Ritter responded that she would refer plaintiff "back to her supervisor for that discussion prior to any determination of work clearance." This was reflected in

A-0494-18T4

Ritter's other notes, where she did not mark that plaintiff was "[u]nable to return to work at this time," but rather marked "other" and wrote that plaintiff "has provided medical documentation requesting work accommodations," which "is to be discussed with her supervisor to see if accommodations can be accepted prior to determination of return to work status."

There was no communication with plaintiff thereafter, except for the letter of termination on March 27. On March 26, Ritter spoke with Dr. Kuris, who estimated that plaintiff would need to work from home two hours per day for two months before being ready to work full time. Before this conversation, Ritter wrote that Weinstein wanted her to "counter" Dr. Kuris' medical clearance, but she told him that would be inappropriate. Ritter also wrote on March 26 that Weinstein "was in agreement" with her that "he should determine if he can accommodate the restrictions prior to any consideration for return to work." However, Weinstein instead went ahead with terminating plaintiff, on the basis that plaintiff "reported to [Ritter] that [she] was not 'emotionally ready' to return to work[,] and [plaintiff] admitted [to Ritter] that [she was returning] only because [she] felt pressured into it." Weinstein confirmed in his deposition this was the only reason for the termination.

These facts first present a material issue of fact as to whether plaintiff was capable of returning to work, with or without the accommodations offered in defendants' essential functions form. An affirmative determination of this issue would satisfy the second prong of plaintiff's prima facie case – the only prong in dispute. Between Dr. Kuris' clearance at the time, the requested accommodation satisfying defendants' essential job functions form, Ritter's refusal to mark plaintiff as "[u]nable to return to work at this time," and plaintiff's denial at her deposition that she told Ritter that she was not ready, there is sufficient evidence for a jury to conclude that plaintiff was capable of returning to work – with some accommodation – when she arrived at defendants' office on March 25.

The motion judge himself essentially conceded there was a question of fact regarding the differing opinions between Ritter and Dr. Kuris on the issue of plaintiff's clearance – he stated "it was debatable, [and] it was a matter of professional medical opinion" before dismissing the issue by stating the opinions were too subjective. The judge made a factual determination on a material issue at the summary judgment stage, and further erred failing to view the evidence in a light most favorable to plaintiff.

The record also presents a material issue of fact as to whether defendants initiated the interactive process in good faith. A reasonable factfinder could

A-0494-18T4

conclude that defendants failed to satisfy this duty at multiple times during plaintiff's leave, leading up to her termination. The point in time when a jury could find defendants breached their duty occurred when Ritter told plaintiff she would arrange a meeting with plaintiff's supervisor regarding the accommodation to work from home for two hours per day, only for defendants to terminate plaintiff two days later, without the meeting ever occurring. Defendants' good faith comes into question at multiple other times:

- Fitzgerald emailed Weinstein twice in early March inquiring when plaintiff will officially be "severed";

- Weinstein sought to have Ritter challenge the decision of Dr. Kuris that plaintiff could return to work;

- Defendants emailed plaintiff at her work email account, for the first time during her leave, on March 11 that she can return to work by March 16 – they then sent the same email to her personal Gmail account on March 15, the day before the March 16 deadline;

- Defendants sent plaintiff the essential job functions form on March 16, which required plaintiff to "[w]ork a steady shift of at least six hours in an office environment." Yet when Dr. Kuris gave his approval and plaintiff showed it to Ritter, she responded that plaintiff still needs to discuss it with her supervisor (which never ultimately happened);

28

- Weinstein agreed to consider the accommodations on March 26, only to fire plaintiff on March 27 solely because Ritter reported that plaintiff stated she was not ready, a report that plaintiff disputes;

- Before she met with plaintiff, Ritter was informed that defendants "had a good candidate that they [were] considering for hire for [plaintiff's] position";

- Ritter estimated having 100 return-to-work appointments during her eight years with defendants, yet she could "only recall denying [plaintiff] out of the 100 people.

In both his written and oral opinions, the motion judge emphasized that a key factor in his decision was plaintiff's failure to meet the March 23 deadline of submitting Dr. Kuris' paperwork, per Weinstein's March 16 email. The motion judge found that since plaintiff received clearance from Dr. Kuris on March 19, then missed the deadline, and did not submit the paperwork from Dr. Kuris until March 25, plaintiff was unwilling to return to work.

We conclude the motion judge failed to view this evidence in a light most favorable to plaintiff. On March 23, the date of the deadline, plaintiff emailed defendants asking if they received the paperwork from Dr. Kuris, and inquired about "making an appointment with [OCC] to try and return." When defendants stated they had not received the paperwork, plaintiff responded that Dr. Kuris "said he

A-0494-18T4

would fill everything out and get it back today[,] [s]o I don't know what happened," and that she would call Dr. Kuris' office.

A rational factfinder could clearly determine that plaintiff was not unwilling to return to work, but rather was actively seeking to return and have the paperwork in by the deadline. Moreover, Weinstein's email states, "Please have your physician return the enclosed [essential functions form] to me no later than March 23." There is no clear threat of terminating or replacing plaintiff if the deadline was missed, and plaintiff did reach out on that date, expecting the paperwork to have been submitted.

Also regarding the missed March 23 deadline, the judge found, "That defendant waited until after the March 25 . . . meeting before finalizing the decision to terminate plaintiff is of no legal significance." The judge seemed to dismiss what occurred after the missed deadline as immaterial; however, this conclusion would potentially permit plaintiff's March 25 meeting with Ritter, and events thereafter, to have been held by defendants in bad faith. Since such a determination would be in violation of Tynan, this part of the judge's ruling clearly cannot be sustained.

The motion judge's reliance on Svarnas is also misplaced. 326 N.J. Super. at 78 (citation omitted) ("An employee who demonstrates an inability to attend work with any degree of predictability and reliability cannot be reasonably accommodated.") In Svarnas, an employee who suffered from asthma and bodily

injuries from a car accident was absent for "more than 600 days in a twenty-two-year period" and did not improve her attendance when allowed to work part-time as requested. Id. at 80. Additionally, the employee's "absences were due to a host of illnesses, not simply her claimed disabilities of asthma and the car-accident-related injuries." Id. at 77. In that context, this court concluded that the employee "failed to demonstrate that, with a reasonable accommodation, she would have been able to perform her job functions satisfactorily." Id. at 80.

Here, plaintiff worked for defendants for nearly twenty years. While she took one leave in 2012, one leave in 2013, and worked from home for sixteen hours per week in 2014, she always received positive evaluations, promotions, and raises. Toward the end of the leave of absence in question, plaintiff received clearance to return from Dr. Kuris, and sought to work in accordance with the essential job functions form given by defendants. The motion judge erred in relying on Svarnas given the facts of this case.

After dismissing plaintiff's discriminatory discharge claims, the motion judge determined he did not need to "elaborate further on [his] reasons for granting summary judgment on plaintiff's retaliatory discharge claim." Since there are multiple issues of fact for a jury to determine regarding the potentially discriminatory discharge, and those issues directly relate to a prima facie retaliation

A-0494-18T4

claim, we discern no basis in the record for the dismissal of plaintiff's retaliatory discharge claim.

> [T]he prima facie elements of a retaliation claim under the LAD requires plaintiff to demonstrate that: (1) plaintiff was in a protected class; (2) plaintiff engaged in protected activity known to the employer; (3) plaintiff was thereafter subjected to an adverse employment consequence; and (4) that there is a causal link between the protected activity and the adverse employment consequence.
>
> [Victor, 203 N.J. at 409 (citing Woods-Pirozzi v. Nabisco Foods, 290 N.J. Super. 252, 274 (App. Div. 1996)).]

Based upon our independent review of the motion record and in consideration of controlling decisions of law, we conclude there existed material facts in dispute in the motion record that preclude the summary judgment dismissal of plaintiff's claims against defendants.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0494-18T4